Argued and submitted June 16, affirmed September 22, 2010

# MARCO ANTONIO MONTEZ,
*Petitioner-Appellant,*

*v.*

## Stanley CZERNIAK,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
97C12376; A130258

239 P3d 1023

Marc Sussman argued the cause and filed the briefs for appellant.

Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

**BREWER, C. J.**

Petitioner, who was convicted of aggravated murder and sentenced to death, appeals a judgment denying post-conviction relief. He argues that the post-conviction court erred in rejecting his numerous claims that counsel in his 1992 penalty-phase retrial proceedings provided constitutionally ineffective assistance of counsel.[1] For the reasons explained below, we affirm.

## I. THE UNDERLYING CRIMES

We begin with the facts of the underlying crimes, as taken from the Oregon Supreme Court opinion on direct review of the initial conviction and death sentence.

"On June 20, 1987, Candice Straub, accompanied by two men, rented a room at the Continental Motel in Portland. The next day, firefighters responding to a fire at the motel discovered Straub's nude and bound body on a bed in one of the motel's rooms. Her body had been doused with flammable liquid and set afire. It was determined later that she had been strangled to death.

"A few weeks later, defendant Marco Montez told Annie Edmo, a woman with whom he had been living in Pocatello, Idaho, that he had helped get rid of the body of a woman in Portland after Tim Aikens, the co-defendant in this case, had strangled her. Edmo reported that statement to the Pocatello police. Defendant was arrested in Pocatello on July 12 on unrelated Idaho charges. The Pocatello police notified the Portland police of his arrest and of Edmo's report.

"Portland Detective Goodale flew to Pocatello to interview defendant. * * *

"In response to Goodale's questions, defendant at first denied any involvement in Straub's murder. He stated that he had met Aikens in Portland and that they had worked together for a day at a cannery. Aikens had met Straub at

---

[1] The standards for determining the adequacy of counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution. Indeed, the Supreme Court has suggested as much. *See State v. Davis*, 345 Or 551, 579, 201 P3d 185 (2008) (equating "effective" assistance with "adequate" assistance).

the cannery, and she had accompanied Aikens and defendant to a drop-in center in Portland when they returned from work. After sleeping for a few hours, the three went to breakfast and to a second hand store before separating. Aikens and Straub went to the Continental Motel; and defendant went to a park, where he remained until Aikens contacted him later. At that time, Aikens told defendant that he had left Straub at the motel and that he wanted to show defendant something there. Defendant, however, declined to go to the motel. Aikens then said that he had a 'problem,' after which defendant and Aikens then made plans to leave town.

"* * * * *

"In response to further questions by Goodale, defendant admitted that he had gone to the motel, where Aikens had showed him Straub's dead body in the bathtub. Aikens told defendant that Straub had refused to have sex with him, that he had hit her, and that she had fallen and hit her head. Defendant stated that he had then left the motel. Defendant stated that Aikens had later admitted setting the motel room afire. Defendant at first denied involvement in the fire, but he later admitted that he had helped Aikens move Straub's body from the bathtub to a bed and had participated in setting the motel room afire. Defendant admitted that it had been his plan to burn the room, but he still denied killing Straub or having sexual relations with her.

"* * * * *

"Goodale resumed his questioning of defendant. Defendant related more incriminating details about Straub's death, although he still insisted that Aikens alone had killed her. Defendant then returned to his cell, but shortly thereafter he asked a jailer to tell Goodale to return and 'to bring his tape recorder.'

"When Goodale arrived, he again advised defendant of his *Miranda* rights. Defendant then admitted that he had participated in Straub's murder. He stated that he and Aikens had beaten, raped, and sodomized Straub and that when she had resisted, Aikens pushed his fist into her anus causing her to bleed profusely. They then tied Straub's arms and legs behind her back and gagged her and put her in the bathtub. Defendant stated that he and Aikens became concerned that Straub might report them to the police, and they decided to kill her. After looping a towel

around Straub's neck, each man pulled one end until she was dead. They then placed her body on the bed, doused it with lighter fluid, set it afire, and left. Defendant admitted that they burned the motel room to destroy any evidence that could link them to the crime.

"Defendant then asked if Goodale knew what would happen to defendant in Oregon. Goodale explained the Oregon homicide laws. Defendant then said that he was willing to plead guilty to murder but hoped that he would not be sentenced to death.

"* * * Goodale again spoke with defendant, who stated that Straub had been conscious when he and Aikens carried her into the motel bathroom and placed her in the bathtub. He also admitted that he rather than Aikens had placed his fist in Straub's anus."

*State v. Montez*, 309 Or 564, 567-69, 789 P2d 1352 (1990).

Petitioner was charged with three counts of aggravated murder, and one count each of first-degree arson and abuse of a corpse. *Id.* at 569 n 1. In 1988, a jury convicted him of the charged crimes and, following a penalty-phase proceeding, sentenced him to death. In that first trial, petitioner was represented by attorneys Brad Grove and Lynne Dickison. On automatic and direct review, the Oregon Supreme Court affirmed the convictions and other sentences, but reversed the death sentence on the basis of its holding in *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990). In *Wagner*, the court, relying on the United States Supreme Court's opinion in *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), held that Oregon's death penalty sentencing scheme was constitutionally infirm because it did not include a fourth, general mitigation, question.

## II.   THE PENALTY-PHASE RETRIAL

The case was remanded for a penalty-phase retrial, and it is counsels' representation of petitioner at that proceeding that is at issue in this appeal. Grove, the attorney who represented petitioner at his first trial, again was appointed to represent him; Dickison initially was replaced by another attorney. On the day set for the penalty-phase retrial, both counsel withdrew due to a conflict resulting from

their representation of one of the witnesses whom the state intended to call. Two days later, Dickison agreed to represent petitioner; she selected Corinne Lai as her second chair. The trial date was postponed. The two lawyers continued to work with Judith Bieberle, an investigator who had been hired by and was working with Grove. In addition, counsel moved for appointment of a mitigation specialist. As will be discussed in more detail below, the trial court denied the motion.

Dickison, Lai, and Bieberle continued preparing for the penalty-phase retrial. Bieberle was sent to Minnesota, where petitioner grew up, to investigate his background. Dr. Lenore Walker, a psychologist, was retained as a defense expert. Walker referred counsel to Dr. Toni Appel, a neuropsychologist, who reviewed Walker's testing and suggested that no neuropsychological assessment was necessary. Nonetheless, counsel had Dr. Les Goldmann, a clinical psychologist, perform a number of neuropsychological tests on petitioner. Goldmann found no neuropsychological deficits, nor did he find evidence of brain injury. Counsel also retained Dr. Gary Jacobsen, M.D., an expert in addiction medicine, to examine petitioner's records to determine whether he suffered from fetal alcohol syndrome and would be treatable in prison. Counsel moved for several continuances to allow them more time to prepare for trial; each request was denied.

Ultimately, a jury was selected and the penalty-phase retrial began. Petitioner's counsel presented a number of expert and lay witnesses in an attempt to convince the jury not to sentence petitioner to death. Petitioner did not testify, nor did he allocute—that is, make an unsworn statement to the jury. The jury voted to sentence petitioner to death, and the trial court entered judgment accordingly.

On automatic and direct review, the Oregon Supreme Court affirmed petitioner's death sentence, and the United States Supreme Court denied certiorari. *State v. Montez*, 324 Or 343, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997). Petitioner filed a petition for post-conviction relief; following a hearing, the post-conviction court entered a judgment denying relief. This appeal follows.

### III. THE POST-CONVICTION CASE
### AND APPLICABLE LAW

In his petition for post-conviction relief, petitioner alleged dozens of ways in which counsel at his initial trial and his penalty-phase retrial were ineffective. In 26 pages of findings and conclusions, the post-conviction court rejected each claim. On appeal, petitioner raises four assignments of error that all relate to the alleged ineffectiveness of counsel at his 1992 penalty-phase retrial. Within those four assignments of error, however, are many specific claims of how counsel allegedly were deficient in the performance of their duties and how those alleged deficiencies affected the outcome of the penalty-phase retrial. The overarching theme of petitioner's opening brief is that counsel failed to present an adequate case on mitigation. We discuss—and reject—several of those arguments below. We also have considered petitioner's remaining arguments, and we reject them without discussion.

■　We begin with general principles. ORS 138.530(1)(a) requires that a court grant post-conviction relief when a petitioner meets her or his burden to establish by a preponderance of the evidence a "substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." A criminal defendant has a constitutional right, under Article I, section 11, of the Oregon Constitution, "to be heard by himself and counsel." That right to counsel includes the right to "an adequate performance by counsel of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf." *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981). Thus, a claim of ineffectiveness of counsel is a claim that the petitioner was denied his or her rights under Article I, section 11.

■ ■　Oregon courts apply a two-part test to determine whether a petitioner's right to effective assistance of counsel was violated:

" 'First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [his lawyer]

failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that counsel's failure had a tendency to affect the result of his trial.' "

*Burdge v. Palmateer,* 338 Or 490, 492, 112 P3d 320 (2005) (quoting *Lichau v. Baldwin,* 333 Or 350, 359, 39 P3d 851 (2002)). That is, to be entitled to relief on a claim of denial of the right to effective assistance of counsel, a post-conviction petitioner must demonstrate by a preponderance of the evidence that (1) counsel performed deficiently and (2) counsel's deficient performance prejudiced the petitioner, that is, that it had a tendency to affect the result of the trial. "Whether a petitioner has demonstrated prejudice is a question of law that, in turn, may depend on the post-conviction court's findings of fact." *Wyatt v. Czerniak,* 223 Or App 307, 311, 195 P3d 912 (2008).

As noted, *see* 237 Or App at 278 n 1, the federal standard has been stated similarly. To prevail on a Sixth Amendment claim of ineffectiveness of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison,* 477 US 365, 381, 106 S Ct 2574, 91 L Ed 2d 305 (1986). That is, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 US at 689.

We review the post-conviction court's judgment for errors of law and to determine whether evidence supports its findings. *Monahan v. Belleque,* 234 Or App 93, 95, 227 P3d

777, *rev den*, 348 Or 669 (2010). We are bound by the post-conviction court's factual findings if they are supported by evidence in the record. *Wyatt*, 223 Or App at 311. If the post-conviction court did not expressly make such findings, and there is evidence from which the facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In reviewing a claim of ineffective assistance, we "will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment[.]" *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823 (2003), *rev den*, 337 Or 327 (2004).

Finally, we briefly set out the law that guides a jury in determining whether to impose a sentence of death. At the 1992 penalty-phase retrial, the parties introduced evidence and made arguments regarding the following three questions:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; [and]

"* * * * *

"(D) Whether the defendant should receive a death sentence."

ORS 163.150(1)(b) (1991). The state was required to prove the affirmative of the first two questions beyond a reasonable doubt. ORS 163.150(1)(d) (1991). The final question frames a discretionary determination for the jury and carries no burden of proof. *State v. Moore*, 324 Or 396, 432, 927 P2d 1073 (1996). Moreover, the court was required to instruct the jury that, it must answer "no" to the third question—"whether the defendant should receive a death sentence"—if "one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that

one or more of the jurors believe would justify a sentence less than death." ORS 163.150(1)(c)(B) (1991).

## IV. PETITIONER'S CLAIMS ON APPEAL

With those general principles in mind, we turn to petitioner's claims in this case, addressing only those that, in our view, require discussion. We begin with a threshold claim that informs petitioner's other claims, because it involves the trial court's choice not to appoint a mitigation specialist. As noted, petitioner's trial counsel (Dickison and Lai) sought the appointment of a mitigation specialist.[2] In his petition for post-conviction relief, petitioner alleged that counsel were ineffective because they "failed to make a record objecting to the trial court's refusal to grant petitioner's motion for appointment of a mitigation expert and showing the prejudice to petitioner caused by the trial court's action." The post-conviction court made three findings in support of its rejection of that claim:

> "44. Petitioner did not produce evidence proving that his counsel in 1992 acted unreasonably by not making more of a record of the judge's decision denying appointment of a mitigation expert.

> "45. Trial counsel in 1992 did make a motion for appointment of a mitigation expert. It is not clear why there is no record of this motion in the trial court record.

> "46. Petitioner did not produce evidence proving that the trial judge should have (or would have, with additional facts) allowed the motion for appointment of a mitigation expert. Just what argument or additional facts might have convinced the judge to grant the motion is unknown."

On appeal, while acknowledging that counsel did seek appointment of a mitigation specialist in addition to investigator Bieberle, petitioner argues that counsel were

---

[2] Petitioner's expert explained that a

"mitigation specialist is a person with a background in human services who conducts a thorough social history investigation of a capital defendant's life. The social history is the base upon which successful mitigation is built. Mitigating factors are aspects of the defendant's background and character that can be considered as a basis for reducing the defendant's moral culpability for the homicide(s). These factors can provide an explanation for the crime that has occurred."

ineffective for failing to make an adequate record regarding the denial of the motion. He asserts:

> "While counsel recognized the need to ask for the mitigation specialist, she had no reasonable explanation for her failure to seek a hearing and make a record, with witnesses or affidavits, showing the need for a mitigation specialist in the kind of detail set out in the affidavits of [petitioner's experts]. Once the request was initially denied it was a suspension of professional judgment to fail to request a hearing and make a better record to support the request."[3]

That is, petitioner argues, not that his counsel performed deficiently for failing to request the appointment of a mitigation specialist, but that counsel should have made a better record after the court denied the request. Petitioner asserts that, if counsel had made a better record regarding the need for appointment of a mitigation specialist, the denial of the motion would have been an abuse of discretion.

The state responds that petitioner did not meet his burden to prove either deficient performance or prejudice. It points out that the post-conviction court found that counsel did move for appointment of a mitigation specialist, a fact that petitioner does not dispute. We agree that that finding is supported by evidence in the record. In her deposition, which was admitted as an exhibit at the post-conviction hearing, Dickison testified that she had a particular mitigation expert in mind, one whom another attorney had referred her to. She explained that she had filed a "formal" motion for appointment of a mitigation expert, including an affidavit explaining the need for such an expert.

As noted, the trial court denied the motion, but Dickison did not then abandon the idea of a mitigation specialist. The transcript of the 1992 penalty-phase retrial reveals that she took additional steps:

> "MS. DICKISON: * * * I had submitted a request for a different type of investigation services through this court, and I'm gingerly stepping around this, but I submitted

---

[3] Although petitioner sometimes refers to his counsel in the singular, we understand his claims generally to apply to both Dickison and Lai; we accordingly refer to counsel in the plural throughout this opinion.

additional affidavits to the court after the court rendered its decision. Have those affidavits changed [the court's mind?]

"THE COURT: Everything that has been requested, denied, is filed.

"MS. DICKISON: The court has not changed its mind given the new affidavits?

"THE COURT: Right."

As stated, to obtain post-conviction relief, petitioner "was obligated to make two distinct constitutional showings: that counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result." *Datt v. Hill*, 347 Or 672, 683, 227 P3d 714 (2010). Here, petitioner introduced expert testimony demonstrating the importance of a mitigation specialist in a capital case, and neither party really disputes that point. But petitioner did not prove that counsels' materials filed in support of their motion were deficient. Although he argues that counsel had no reasonable explanation for their failure "to seek a hearing and make a record, with witnesses or affidavits, showing the need for a mitigation specialist in the kind of detail set out in the affidavits of [petitioner's experts]," the record demonstrates that counsel did in fact make a record to support the appointment of a mitigation specialist.[4] Petitioner did not carry his burden of proving that counsel performed deficiently in that respect.

Petitioner next argues that the post-conviction court erred in denying his claim that counsel were ineffective for failing to investigate and present evidence of his traumatic sexual experiences, evidence that he asserts would have been mitigating. In the post-conviction court, petitioner presented evidence that his mother sexually abused him when he was a child and that she threatened to harm him if he disclosed the sexual abuse while he was undergoing residential alcohol treatment as an adolescent at St. John's Hospital in St. Paul,

---

[4] Petitioner argues that "[i]t is erroneous to excuse counsel's failure to obtain a mitigation specialist, even when initially rebuffed by the court, in order to meet her obligation to conduct a constitutionally adequate mitigation investigation by saying, in effect: 'well, she did ask once!'" But, as the transcript of the 1992 penalty-phase retrial demonstrates, counsel did not abandon their efforts after asking only once.

Minnesota. He also introduced evidence that, when he was 19 years old, he had a sexual encounter with his former foster mother. According to petitioner, information about those experiences was available to counsel—in records from St. John's, in records of petitioner's interviews with Detective Goodale, and in a statement from another witness—as they prepared for the 1992 penalty-phase retrial.

The post-conviction court made findings in support of its rejection of petitioner's claim about evidence of traumatic sexual experiences:

"58.   Trial counsel constructed a reasonable theory of mitigation based on petitioner's history of childhood abuse and Dr. Walker's undisputed expertise in the area of post-traumatic stress disorder [(PTSD)], after a thorough investigation of petitioner's family history.

"* * * * *

"61.   Trial counsel adequately introduced petitioner's mental health and family history through Dr. Walker.

"62.   Petitioner did not present credible evidence to prove that trial counsel in 1992 failed to adequately investigate, prepare, and present the defense experts with information concerning petitioner's mental health and family history.

"63.   Trial counsel provided Dr. Walker with all available and reliable information about petitioner's mental health and family history.

"64.   Petitioner did not present evidence to prove that trial counsel in 1992 failed to provide Dr. Walker with all necessary information concerning petitioner's mental health and family history."

On appeal, petitioner argues that counsel were ineffective for failing to more fully investigate his traumatic sexual experiences, for failing to provide information about those experiences to defense expert Walker, and for failing to present that evidence to the jury. According to petitioner,

"Montez's attorneys did not investigate the sex abuse issue. Dr. Walker, who was not informed of the abuse by counsel, did not fully explore this area. Montez did tell Dr. Walker his mother awoke him and his sister and told them to slow

dance in their underwear and hug and kiss on the lips [when he was living with her as a child]. Dr. Walker did ask Montez if he thought this was sex abuse; he said no because he did not understand that to be sexual abuse.

"The failure to investigate and present evidence of Montez's traumatic sexual experiences, including the abuse by his mother and encounter with [his former foster mother], deprived the jury of critical mitigation.

"* * * * *

"* * * The evidence of sexual abuse and other traumatic sexual exposure would have provided an unequivocal factual foundation for Dr. Walker's PTSD diagnosis because the impact of sexual abuse was clearly recognized at that time."

The state responds that the post-conviction court's findings are supported by evidence in the record and are dispositive. It asserts generally that much of the information to which petitioner refers came to light only in his deposition taken for the post-conviction proceeding, years after the penalty-phase retrial. Specifically, the state claims, petitioner's records from St. John's "contain only two cryptic references to petitioner's allegation of sexual abuse." It asserts that the witness who referred to petitioner's sexual abuse was not a reliable witness and had no personal knowledge of any abuse.

The state points to Dickison's deposition testimony that she and Lai provided all records to Walker for use in her evaluation. It asserts that Walker's notes show that she specifically asked petitioner whether he had been sexually abused and that petitioner asserted that no sexually inappropriate touching had occurred.[5] The state notes that petitioner acknowledged in his deposition that he did not tell Walker about anything other than the "dancing in the underwear" incident, nor did he report to her that he had been sexually abused.

We agree with the state that the post-conviction court's findings are supported by evidence in the record and

---

[5] Petitioner interprets Walker's notes differently. He does not dispute, however, that he never told Walker that he had been sexually abused.

that the court correctly concluded that counsel were not ineffective for failing to pursue and present evidence of petitioner's sexual abuse. The record is clear that, at the time counsel were preparing their case, there were few clues as to petitioner's childhood sexual abuse, and those clues were vague. The record supports the post-conviction court's finding that counsel "provided Dr. Walker with all available and reliable information about petitioner's mental health and family history." Especially in light of petitioner's failure to disclose any sexual abuse to Walker, it was reasonable for counsel not to pursue that evidence. To be sure, in hindsight, there may have been more there than met the eye. But, in determining whether counsel's performance was deficient, we must evaluate their conduct from their perspective at the time. *Lichau*, 333 Or at 360. Counsel's choice to give all the material to Walker and to rely on her to evaluate it was not, as a matter of law, unreasonable. The trial court correctly denied petitioner's claim based on evidence of childhood sexual abuse.

■ Petitioner next argues that counsel were ineffective for failing to develop evidence of his head trauma, seizure disorder, and organic impairment and to present that information to defense experts. In his petition for post-conviction relief, petitioner alleged that counsel were ineffective for failing to

"adequately investigate, prepare and present evidence of petitioner's mental condition at the time of the offense in light of petitioner's intoxication, and history of depression and suicide attempts, past substance abuse and history of factors associated with the presence of organic brain damage as mitigation evidence[.]"

"* * * Trial counsel failed to adequately investigate, prepare and present defense experts with evidence concerning aspects of petitioner's * * * mental condition at the time of the offense and factors associated with the presence of organic brain damage[,] which was necessary to obtaining a complete and reliable evaluation and report on mitigating factors[.]"

The post-conviction court rejected petitioner's claims, making the following findings:

"52. Trial counsel in 1992 adequately investigated the possibility of fetal alcohol syndrome, organic brain damage, and other psychological factors as mitigation.

"53. Trial counsel retained Dr. Lenore Walker as an expert on mitigation issues. Counsel followed through with Dr. Walker's recommendation that petitioner be evaluated by a neuropsychologist.

"54. Trial counsel retained Dr. Les Goldmann to conduct a neuropsychological evaluation, but the evaluation produced no evidence that petitioner suffered from any kind of organic brain damage.

"55. Dr. Goldmann and trial counsel were constrained by the short time frame to prepare for trial and the trial court's unwillingness to set over the 1992 trial date.

"56. Dr. Jacobsen saw no evidence of brain damage, and Dr. Antoinette Appel, a neuropsychologist who trial counsel consulted in 1992, told counsel that she thought a neuropsychological evaluation was unnecessary.

"57. Petitioner did not present credible evidence to prove that he had organic brain damage at the time of the crimes."

On appeal, petitioner argues that the "records and witnesses available to counsel revealed Montez had a seizure disorder and an extensive history of head injury and the potential of brain damage." In light of that information, petitioner urges, "counsel should have obtained a complete and comprehensive neuropsychological evaluation." To support that contention, petitioner introduced in the post-conviction court the affidavit of Dr. Richard Kolbell, a clinical neuropsychologist. Kolbell spent eight hours conducting a neuropsychological evaluation of petitioner, and he prepared a report, a copy of which was introduced in the post-conviction court. Based on Kolbell's report, the report of Dr. Mark Cunningham (a forensic psychologist who also evaluated him), and the affidavits of his experts on mitigation (McMahill and Barker), petitioner concludes that the post-conviction court erred in denying relief:

"The post-conviction court's Findings of Fact * * * and conclusion that trial counsel conducted an adequate investigation into this area simply disregards the foregoing

information on the record and uncontradicted testimony of Barker, McMahill and Drs. Kolbell and Cunningham. Thus, the [post-conviction] court's findings are inconsistent with the record and denial of relief on this claim was error."

We disagree. As stated above, at Walker's suggestion, counsel had petitioner evaluated by a neuropsychologist, Goldmann. Goldmann told counsel that he would conduct a screening evaluation and that, if that evaluation revealed signs of brain injury, he would conduct further evaluation. He stated that, if there were no indications of brain injury on screening, there would be no need to conduct a full assessment. In his affidavit submitted in the post-conviction proceeding, Goldmann stated:

"In my experience, it is not only unlikely but improbable that deficits will be found on a full neuropsychological evaluation when the results of the screening battery were normal. If one conducts enough tests, however, one can usually find an anomaly, simply because the statistical chance of finding a significant result increases with the number of tests administered."

Goldmann evaluated petitioner over two days in July 1992. He administered tests that "are particularly sensitive to deficits seen in brain-injured individuals," but he found "no neuropsychological deficits * * *." That is, he "saw no evidence of brain injury." In performing the tests, Goldmann would have asked petitioner about any history of head injury, substance abuse, or telltale symptoms. In his affidavit, Goldmann averred, "It was my opinion in 1992 that Mr. Montez did not suffer from brain injury in any form * * *."[6] As noted above, Appel, another neuropsychologist, told counsel that it was unnecessary to conduct a neuropsychological examination of petitioner. Jacobsen, the expert in addiction medicine, who also evaluated petitioner in 1992, similarly had no sense that brain damage had occurred.

---

[6] In the post-conviction court, petitioner submitted a supplemental affidavit by Goldmann that appears to contradict much of what he said in the affidavit submitted by the state. But the post-conviction court made findings that align with what Goldmann said in his initial affidavit, and those findings are supported by the record. Accordingly, we disregard any discrepancies between the two affidavits.

Petitioner's premise seems to be that, because he produced evidence in the post-conviction case that he may have been suffering from brain damage in (and before) 1992, he is entitled to relief. But the issue on appeal in this post-conviction proceeding is not whether petitioner actually had suffered brain damage or even whether he introduced evidence of brain damage in the post-conviction court. Rather, it is whether the post-conviction court's findings are supported by the record and whether those findings support the court's conclusion that counsel were not deficient in their performance. Here, counsel investigated the possibility that petitioner suffered from brain damage, and they employed experts to determine whether that was the case. Petitioner did not prove that counsel failed to exercise reasonable professional skill in their treatment of the possibility of brain damage.

■ Petitioner next argues that counsel were ineffective in failing to educate the jury in *voir dire*, opening statement, and closing argument that a single "no" vote was sufficient to return a verdict of life imprisonment; in failing to ensure that the jury was properly instructed on the effect of a "no" vote; and in failing to ensure the "return of a lawful life verdict." In his petition for post-conviction relief, petitioner made several allegations concerning deficient performance related to the "no" vote:

"35.   a.   Trial counsel failed to educate the jury in *voir dire*, opening statement or closing argument that a single 'no' vote was sufficient to return a verdict of life imprisonment, and there was no such thing as a hung jury in a capital sentencing trial;

"b.   Trial counsel failed to request a jury instruction [that] clearly informed the jury that any of the relevant questions must be answered in the negative and a 'life' verdict would be returned if any one or more of the jurors voted 'no' on any question, either when the court instructed the jury, or in response to a question from the jury on September 17, 1992 asking whether 'all 12 jurors have to agree on question #3';

"c.   Trial counsel failed to educate the jury in *voir dire*, opening statement or closing argument that each juror was required to give individualized meaningful consideration

and full effect to mitigating evidence offered by the defense, and that mitigation is any evidence that any juror believed is sufficient to justify a sentence of less than death, as required by the Eighth and Fourteenth Amendments to the United States Constitution and the Oregon Constitution;

"d. Trial counsel failed to request jury instructions which clearly informed the jury that each juror was required to give individualized meaningful consideration and full effect to mitigating evidence offered by the defense as required by the Eighth and Fourteenth Amendments to the United States Constitution and the Oregon Constitution[.]"

The post-conviction court rejected petitioner's claims, finding that petitioner did not prove that counsel had performed deficiently.

On appeal, petitioner makes a number of inter-related arguments as to why the post-conviction court erred in rejecting his claims about counsel's "education" of the jury, approach to jury instructions, and failure to object to the verdict. Relying on his expert's affidavit setting out the standards by which counsel should have conducted themselves in the 1992 penalty-phase retrial, petitioner asserts that the post-conviction court erred in concluding that counsel were not ineffective in how they chose the jury, what arguments they made to the jury, what jury instructions they requested, and how they responded to the jury's verdict. In addressing petitioner's arguments, we begin by summarizing again the law governing the jury's deliberations, as it stood in 1992.

ORS 163.150, the statute that governs the penalty phase of an aggravated murder trial, sets out four questions that the jury must answer. One of those questions, which relates to provocation by the victim, is not given if there is no evidence of provocation; it was not given in this case. Accordingly, the jury was presented with three questions: (1) whether petitioner committed the murder deliberately with the reasonable expectation that the victim's death would result; (2) whether there was a probability that petitioner would commit criminal acts of violence that would constitute a continuing threat to society; and (3) whether petitioner should receive a death sentence—the "general

mitigation" question required by the Eighth Amendment after *Penry*.

Before *voir dire* began, the trial court in petitioner's penalty-phase retrial instructed the potential jurors about the three questions set out above. Regarding the third question, the court told the potential jurors, "Now, you should answer this question no if you find that there is any aspect of the defendant's character or background or any other circumstance of the offense that you believe would justify a sentence less than death." The court also explained the effect of a "no" vote:

> "If you find that the state has proven the affirmative of the three questions beyond a reasonable doubt, you answer each question yes. Before any question can be answered yes, all 12 jurors must agree on that answer.

> "If you decide that the state has failed to prove the affirmative on any one or more of the questions beyond a reasonable doubt, then you must answer that question no. If all 12 jurors cannot agree that a particular question should be answered yes, then the answer must be no.

> "Now, if your answer to all three questions is yes, the law requires that the penalty shall be death. If your answer to one or more of the questions is no, the law requires that the penalty shall be life imprisonment."

After the parties' closing arguments, the court again instructed the jury (as required by ORS 163.150(1)(c)(A)) on how to address the three questions:

> "Now, in determining the issues raised in these questions before you, you may consider any evidence which you consider to be mitigating. This includes, but is not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct, and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

> "* * * * *

> "Now as a reminder, in order to answer yes to any of the questions, 12 of you, all of your number must agree on that answer. If upon any question all of your number, 12 of you cannot agree that the question is should be answered yes, then your answer to that question must be no."

The jury deliberated over four days. At one point, the jury submitted three written questions to the trial judge. One of the questions asked, "Do all 12 jurors have to agree on question # 3?" That inquiry referred to the "general mitigation" question, whether the defendant should receive a death sentence. The trial judge responded in writing, "In order to answer 'yes' to any question, 12 of you must agree on that answer." When, the next day, the jury returned its verdict of death for petitioner, counsel requested that the court poll the jury. The court refused to conduct an oral poll, but it did administer a written poll.

As noted, petitioner makes a number of interrelated arguments regarding how counsel handled arguments, jury instructions, and the verdict. Petitioner is correct, of course, that a single juror's vote not to impose a death sentence precludes imposition of that sentence. But the jurors were told that twice by the court. Although petitioner may believe, in hindsight, that counsel should have emphasized that point, counsel's choice to focus opening statements and closing arguments more generally on the mitigating evidence was not, as a matter of law, deficient. This court "will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment[.]" *Cunningham*, 186 Or App at 226. In light of the correct instructions by the trial court that addressed the effect of a "no" vote—both before *voir dire* and after the parties rested at trial—it was reasonable for counsel to devote argument to other matters. Thus, counsel's choice not to inquire into the effect of a "no" vote during *voir dire* and not to focus their argument on that point was reasonable.

Petitioner argues that counsel should have asked the trial court to expand on its answer to the question sent out by the jury during deliberation. Describing the trial judge's answer to the question as "incomplete and misleading," petitioner asserts that counsel should have requested that the court give the following answer:

"This question calls for a discretionary determination by each juror. If all 12 jurors do not agree that the answer to this question is 'yes,' then you must answer this question 'no.' **You must answer this question 'no' if one or more**

**of the jurors** find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

(Boldface in original.) As stated above, the trial court answered the question by stating, "In order to answer 'yes' to any question, 12 of you must agree on that answer." Of course, implicit in that statement is the converse: If any one of the jurors did *not* agree that any of the three questions should be answered "yes," the jury as a whole could not do so, and the answer would have to be "no."

As the state correctly points out, a court is not obligated to give an instruction that states merely the converse of a correct instruction. *State v. Nefstad*, 309 Or 523, 549-50, 789 P2d 1326 (1990). Here, petitioner asserts that counsel should have argued to the trial court that it should respond to the jurors' question with a statement that (1) repeated what the court already had instructed the jury and (2) explicitly stated the converse of what the statement given implied. Because the trial court's response was legally correct, petitioner has not demonstrated that the trial court would have (or should have) agreed to another response, or that any other response to the jurors' question would have had a tendency to affect the outcome of the penalty-phase retrial.

Petitioner's final argument related to the "no" vote issue is that counsel should have objected to the trial court's refusal to conduct an oral poll in open court when the jury returned its verdict. Petitioner concedes that counsel asked the court to poll the jury and that the trial court had statutory authority, ORS 136.330, to conduct a written poll. He contends, nonetheless, that "[c]ounsel should have objected on the grounds that administering a written poll in the jury room rather than an oral poll in open court violated [his] right to due process and was an abuse of discretion by the trial court."

The short answer to petitioner's argument is that he failed to demonstrate in the post-conviction court that, had counsel attempted to do more to persuade the trial court to conduct an oral poll in open court, it would have done so and, if it had, that any of the jurors would have answered any of

the questions "no." Because defendant failed to show that different conduct by counsel—here, doing more than requesting a poll—would have had a tendency to affect the verdict, the post-conviction court correctly rejected his claim that counsel were ineffective.

■ In his second assignment of error, petitioner argues that he was denied effective assistance of counsel when counsel introduced evidence informing the jury that he previously had been sentenced to death and was then on death row, and advised him to waive objections to the introduction of such evidence. In his third assignment of error, petitioner asserts that trial counsel were ineffective in "preparing for and presenting a defense on the sentencing question on 'risk of future acts of violence.'" As a sub-claim under his third assignment of error, petitioner asserts that counsel were

> "ineffective by calling as character witnesses from death row, administrative segregation, and disciplinary segregation, at the Oregon State Penitentiary without conducting interviews, or meeting with the witnesses prior to trial and then failing to object to irrelevant and prejudicial questions about the lengths of their sentences and scheduled parole release dates or about escapes and attempted escapes from prison."

Because they are related, we address petitioner's second assignment of error and the "inmate witness" subargument under his third assignment of error together. In addressing petitioner's claim, we begin by setting out how the issue of petitioner's previous death sentence and housing on death row arose.

In any penalty-phase retrial, the court and the parties are faced with the awkward reality that the jury has been convened only to decide a penalty, often years after the guilt phase took place. What to tell the jurors about the previous proceedings and how much detail to give them presents a dilemma for the parties and the court. At a hearing held before the commencement of the penalty-phase retrial, Dickison told the court that she was concerned that "any of the jurors or prospective jurors will know that a previous sentence of death had been imposed upon" petitioner, and that she intended to file a written motion to "exclude all jurors

who are aware of the previous death sentence." The court agreed that the jury should not consider petitioner's previous death sentence:

"As a matter of procedure, I suppose I could, if reminded, ask each and every juror before you started whether they had any information about [petitioner's] trial or sentence. Any. Now, did you want me to be more specific than that?"

After additional discussion, Dickison asked the court to inquire of the potential jurors whether they had any information regarding previous "court hearings" involving petitioner. Dickison also noted that the juror questionnaire asked the potential jurors what, if anything, they had heard about the case. After the jury was selected and sworn, the parties and the court engaged in additional discussion of how to inform the jury of petitioner's convictions in a way that would make it less likely that the jurors would speculate about the outcome of the previous sentencing phase.

That state of affairs continued until the second day of trial. As the parties took a break from a discussion of how the state would introduce the recorded testimony of a witness who had died since the first trial, Dickison raised a different issue:

"Judge, while we're waiting, and I've conferred with Mr. Montez about this, it would seem since we're now going into the previous trial anyways, it would seem that the court might want to instruct the jury as to the previous proceedings in this case."

The court and counsel discussed how the jury would be informed of petitioner's convictions and why they were there to decide his sentence. The court suggested the following solution:

"THE COURT:   How about this: Members of the jury, as you are now probably aware, Mr. Montez was convicted of Aggravated Murder, as we've discussed, by a jury after a trial in 1988. An appeal was taken—and I'd like to say as required by law, but I don't know whether that's going to flag the results of that prior case, I don't think they're sophisticated enough to understand the mandatory appeal.

An appeal was taken as required by law and a new sentencing hearing ordered. You have been impaneled to decide that sentence."

Dickison agreed with that proposal.

Petitioner's other attorney, Lai, however, then proposed that the jurors be told about the first death sentence:

"Your Honor, I think the defense team with a great deal of reservation feels that it is necessary at this point for the jury also to be informed Mr. Montez was sentenced to death by the first jury, but in some fashion told that they are not to consider that as part of their deliberation, because the evidence presented may or may not be the same as what was presented then.

"THE COURT:   Boy, I'm—

"MS. LAI:   We're asking for that instruction simply because it will become very clear that Mr. Montez was on death row as we go through the rest of this trial."

The prosecutor pointed out that he had instructed all the state's witnesses to avoid mentioning that petitioner had been housed on death row, thereby avoiding the inference that he had previously been sentenced to death. The judge asked Lai whether that information changed her opinion, but she explained that it did not:

"MS. LAI:   No, because it is our understanding that the State intends to bring in acts allegedly or committed by Mr. Montez while in the penitentiary system, part of that time was while he was on death row, and the defense needs to and will offer some sort of explanation for that activity in that specific area of the penitentiary."

The court expressed its hesitancy to instruct the jurors that petitioner had previously been sentenced to death. After Lai again conferred with petitioner, the following exchange took place:

"MS. LAI:   Your Honor, it is the desires of Mr. Montez that the jury be told about the prior death sentence.

"* * * * *

"THE COURT: Mr. Montez, have you had sufficient time to speak with your attorneys? You feel adequately advised? You know my reluctance to do this.

"[PETITIONER]: Yes, we will proceed that way."

Lai again noted petitioner's agreement to the plan: "Mr. Montez wishes to go through with advising the jury of the prior death penalty sentence, and is prepared to answer your questions."

In response to the prosecutor's request that the court ensure that petitioner understood the choice he was making, the trial court questioned petitioner:

"Now, Mr. Montez, as to my giving this [instruction about the previous death sentence,] do you want me to give it?

"[PETITIONER]: Yes.

"THE COURT: And do you understand that because of your asking for this and not objecting * * *, that in effect your ability to have this matter overturned or reversed based upon my doing this is nonexistent in a real sense?

"[PETITIONER]: I understand that.

"THE COURT: And have you had a sufficient chance to talk to Miss Lai and talk to Miss Dickison so you feel you've gotten the legal advice that's necessary for you to talk to me about this?

"[PETITIONER]: I have, Your Honor.

"THE COURT: Any questions?

"[PETITIONER]: No."

The jury returned to the courtroom and the trial court gave the following instruction:

"Before we proceed to the next witness, I want to explain something to you in an effort to remove the mystery or any speculation from this matter: As you're all now probably aware, Mr. Montez was convicted of Aggravated Murder, as we've discussed here, by a jury after a trial in 1988. A death sentence was imposed. An appeal was taken, as required by law, and a new sentencing hearing was ordered. You've been impaneled to decide the sentence.

"Now as to your role as the trier of facts, this is a new proceeding, and you will decide the weight to be given the evidence presented here, which may be different than the evidence presented before.

"Now, what happened previously, with the exception of the guilty finding, is not a consideration in this case. I tell you this because I don't want you wondering, and I don't want you speculating, and I don't want you to misuse the information before you."

The state subsequently presented evidence of petitioner's fights with other inmates while he was in prison; one of those fights involved another death row inmate. In response to some of that testimony, petitioner's counsel elicited testimony from the state's witnesses about the conditions petitioner faced while incarcerated on death row. They then presented testimony from several inmates, including death row inmates, to explain conditions on death row and to describe petitioner's behavior while incarcerated. Some of those inmates testified that petitioner had helped them and inspired them, and others testified that they had seen improvements in petitioner's behavior during his incarceration.

In his petition for post-conviction relief, petitioner alleged that trial counsel were ineffective because they "introduced evidence that petitioner previously had been sentenced to death and had been on death row and advised petitioner to waive any objections to the introduction of such evidence[.]" He also alleged that counsel were ineffective for calling the inmates as witnesses; for failing to interview the inmate witnesses; for eliciting or failing to object to the inmate witnesses' testimony about the lengths of their sentences and scheduled parole release dates; and for failing to object to "irrelevant and unduly prejudicial testimony" by two inmate witnesses about the circumstances of their escapes and attempted escapes from prison. The post-conviction court rejected the claims, making the following findings of fact:

"74. Petitioner did not produce evidence proving that his counsel in 1992 unreasonably disclosed that petitioner had previously been on death row.

"75. Petitioner wanted the jury in 1992 to learn that he had been on death row and had generally gotten along well with the other inmates on death row and in general population.

"76. Petitioner did not produce evidence proving that his counsel in 1992 acted unreasonably in preparing for, and in calling, inmates to testify on petitioner's behalf.

"77. It was petitioner's decision to call inmates to testify on his behalf, to show that he was not dangerous or violent in the prison setting.

"78. Petitioner personally selected the inmates that he wanted to testify on his behalf."

On appeal, petitioner argues first that counsel's decision was "not only unreasonable, it was a total abdication of their duty to provide competent representation." He asserts that counsel had other, "less prejudicial means of offering the same evidence." Petitioner claims that the information about the prior death sentence "is the type of evidence that is so prejudicial that it denied Montez a fair trial." Petitioner also argues that his consent to counsel's approach should be disregarded because it was based on poor advice of counsel.

The state responds that counsel's choice to inform the jury about petitioner's previous death sentence and his housing on death row was a reasonable tactical choice. It asserts that the related claim that counsel gave petitioner bad advice about whether to inform the jury about his death sentence and housing was not presented in the petition for post-conviction relief and thus is unpreserved and, in any event, is inconsistent with the record. The state explains:

"Counsel had the choice of two evils—they could provide no information and allow the jury to speculate about what misdeeds caused petitioner to be in prison, or they could allow the jury to hear that petitioner was in prison because of an overturned death sentence. Further, * * * counsel had little mitigating evidence to present, and in light of petitioner's expressed desires, counsel reasonably asked the court to truthfully inform the jury of petitioner's prior death sentence. By doing so, counsel ensured that it would not appear to the jury that petitioner was attempting to conceal the facts of the case. Moreover, petitioner could freely present

mitigating evidence to help explain why he was involved in fights in prison."

Finally, the state asserts, petitioner failed to prove that any actions by counsel prejudiced his case.

We agree with the post-conviction court's rejection of petitioner's claim, for two reasons. First, although petitioner asserts that it was counsel's idea to inform the jury of the prior sentence and that he merely "acquiesced" in it, the post-conviction court found otherwise: "Petitioner wanted the jury in 1992 to learn that he had been on death row and had generally gotten along well with the other inmates on death row and in general population." That finding is supported by the colloquy between petitioner and the trial court in the 1992 penalty-phase retrial. It was petitioner's burden to show that his affirmative, well-documented choice to follow that strategy was the result of bad advice, and he did not carry that burden. In short, the record supports the post-conviction court's finding that the choice—no matter whether it was petitioner or counsel who initially proposed the strategy—was petitioner's. The point is not dispositive, because counsel's duty can include trying to persuade a client against implementing an ill-advised litigation strategy. However, such persuasion may be more difficult and, in the end unsuccessful, where, as the post-conviction court found here, the strategy originated with the client.

In any event, counsel's strategy was not unreasonable. "It is well established that a reviewing court will not second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001). Here, we agree with the state that counsel's choice of strategy did not demonstrate deficient performance. For example, counsel reasonably could have believed that it would benefit petitioner if the jury knew not only that another jury had sentenced him to death, but that the death sentence had been determined by a court to be improper. Moreover, a jury could believe that a death row inmate might have nothing to gain from pretending, such that his exemplary behavior is more likely to be heartfelt than is the case with other inmates. We

reject petitioner's position that it is never appropriate to tell a jury in a penalty-phase rehearing that the defendant had previously been sentenced to death.

■ We turn to the related claim regarding the choice to call death row inmates to testify on petitioner's behalf. Petitioner argues that the witnesses' testimony "harmed Montez's case, because these character witnesses were convicted violent felons who lacked credibility with and fostered little [or] no endearment from the jury." He points out that the jury was taken to the Oregon State Penitentiary to hear the inmates' testimony. He points out that none of the inmate witnesses was interviewed by the defense team before they testified. He asserts that counsel's handling of the witnesses at trial prejudiced him:

> "Montez was further prejudiced when counsel either elicited or allowed in, without objection, from most of these witnesses the existence and circumstances of prior early releases from prison, present parole release dates and the circumstances of past escapes and attempted escapes. This testimony[,] along with the mention of 'death row,' was inflammatory and induced the jury to vote for the death penalty to ensure that Montez would not be paroled or escape in the future."

The state responds that it was petitioner's choice to call the inmate witnesses and that the witnesses testified favorably for petitioner. They generally described how he had helped them, how he was not an aggressor, how he acted as a peacekeeper, and how he was attempting to transform himself into a better person. The inmates also testified about the conditions in prison generally and on death row specifically, and how those conditions caused tension among the prisoners. The state points out that the prosecutor did not impeach the inmates regarding their positive substantive testimony about petitioner, but only asked about their sentences, release dates, and escape attempts. It also notes that the record refutes petitioner's assertion that counsel did not adequately prepare for the inmates' testimony. Counsel's—and petitioner's—tactical choice to call the inmates, the state concludes, was reasonable.

We agree. First, it is undisputed that petitioner himself made the choice to call the inmates and that he personally chose the inmates who would testify. The record supports the post-conviction court's finding that petitioner wanted the inmates to testify to the positive improvements he had made while in prison, partly to rebut the state's evidence of some assaultive behavior on his part. As the United States Supreme Court explained in *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." 466 US at 691.

Here, petitioner—who was very active in the preparation and presentation of his case—wanted the inmates called. Although counsel initially questioned the wisdom of that approach, they decided the approach was reasonable in light of the sparse mitigation hand they had been dealt. As Dickison testified in the post-conviction court:

> "It's my recollection—whether it's right or wrong—that [petitioner] very much wanted the jury to learn what the [prison] environment was like. [He wanted the jury to be] introduced to some of the other long-term guests there, and be told of the type of situation it was there."

In response to the state's attorney's question about other mitigating evidence, Dickison conceded that "[t]here was not an awful lot." When asked if she had tried to dissuade petitioner from having the inmate witnesses called, Dickison responded:

> "I don't think I tried to dissuade him. I think I did tell him I didn't like the idea.
>
> "But then again, there was some advantage to exposing a jury who probably wasn't aware of that sometimes evil things that human beings can do to other individuals who had done the same thing and were not sentenced to death.
>
> "This is an appalling case to practiced lawyers. To a jur[or] who spends her life teaching * * * second graders or whatever, you have to get over that initial recoiling."

Given the dearth of other mitigating evidence and petitioner's insistence on calling the inmate witnesses, counsel were not ineffective for following that strategy.

Nor does the record support petitioner's claim that counsel were unprepared for the presentation of those witnesses. When Dickison was asked about whether the inmates had been interviewed before they testified, she stated that there had been communication with the inmates, that she was aware of their criminal records, that she had an overview of what their testimony would be, and that petitioner had represented that each inmate would testify favorably. Moreover, petitioner did not prove that counsel's choice not to object to testimony about early release from prison amounted to deficient performance or that it prejudiced him. As Dickison testified, "there's always a weighing that occurs when you're examining or cross-examining or objecting to witnesses, and you have to decide if it's going to make the unwanted statement more important to the jury if you object and bring attention to it or if you don't." Even assuming that counsel's choices regarding use of the inmate testimony and whether to object to some of it were not, in hindsight, the best choices, that is not the test. Even effective counsel may make "tactical choices that backfire, because, by their nature, trials often involve risk." *Krummacher*, 290 Or at 875. The post-conviction court's findings are supported by evidence in the record and dispose of petitioner's arguments about the inmate testimony.[7]

---

[7] As noted, petitioner asserts that counsel should have objected to evidence of the inmates' sentences, release dates, and escapes. On direct review of the penalty-phase retrial, the Supreme Court held that evidence of early release from prison was not relevant, so that the trial court erred in admitting it. The court concluded, however, that the error was harmless, as the jury heard—without objection—substantially similar testimony from other inmates. The court also refused to address petitioner's claim on direct review that the trial court had erred in admitting evidence of escapes and attempted escapes, as counsel had not objected and the claim was, therefore, unpreserved. *Montez*, 324 Or at 355-56. But a determination on direct review that a claim is not preserved is a far cry from a determination in post-conviction that counsel's choice not to object to certain evidence demonstrates ineffective assistance. As noted, counsel reasonably chose not to object to the evidence.

As stated above, petitioner's third assignment of error includes several specific claims under the general heading that counsel failed to provide effective assistance in "preparing for and presenting a defense on the sentencing question of 'risk of future acts of violence.'" Having resolved petitioner's subclaim regarding testimony by prison inmates, we turn to his argument that counsel generally failed to adequately address the "future dangerousness" question that the jury would answer. Petitioner asserts that the state's theory was that, based on petitioner's past criminal and assaultive behavior and the extreme nature of the crime, the jury should answer "yes" to the future dangerousness question. Counsel's job, according to petitioner, was to rebut that argument by presenting evidence to neutralize or explain petitioner's prior violent acts and to demonstrate that he was unlikely to commit serious acts of violence in prison. According to petitioner, "[a]ccepted practice among reasonable capital defense counsel was to introduce evidence in the penalty phase which rebutted [the type of arguments made by the state] and dispelled the notion that the client is dangerous based on the nature of the crime and/or his past crimes."

One of petitioner's specific arguments about his counsel's alleged failure to rebut the state's case on future dangerousness is that counsel offered the jury "no meaningful evidence upon which to make their evaluation of the risk that Montez presented." As the state characterizes the argument, petitioner asserts that "counsel failed to investigate and present expert testimony on assessing the risk of violence and prison management[.]"

In the post-conviction court, petitioner introduced the affidavit of Cunningham, a nationally recognized clinical and forensic psychologist. Cunningham evaluated petitioner and reviewed records from a variety of sources. In his 181-page affidavit, he discussed both petitioner's background and personal characteristics, and how capital defendants generally should be assessed for risk. In Cunningham's opinion, counsel in the 1992 penalty-phase retrial failed to present necessary evidence on risk assessment:

> "The errors in violence risk assessment that characterized Mr. Montez' capital murder sentencing phase trial were

neither inevitable nor unavoidable. There was conceptual and research literature regarding violence risk assessments, and violence risk assessments of capital offenders easily available to experts or defense counsel in 1992 that would have been of significant assistance to the jury both in avoiding misconceptions and error, and in approaching the capital sentencing risk assessment task with a greater degree of scientific understanding. Mr. Montez' risk of serious violence while incarcerated could have been reliably estimated utilizing actuarial techniques that were then individualized to him. These risk estimates were not appropriately expressed as the sort of global categorical conclusions offered in argument by the State. Instead, they would have been most informatively expressed as probabilities— as statements of relative likelihood."

Cunningham concluded that "[r]eliable methodology and research data was available at the time of Marco Montez' capital sentencing trial in 1992 and could have had an important impact on the jury in avoiding error in their assessment of his future violence risk." Petitioner asserts that "Dr. Cunningham demonstrated that offenders with capital offenses present a low risk of committing violent acts while in prison and on old age parole and that Montez fit within the overall pattern." The type of actuarial data supplied by Cunningham should have been presented in 1992, according to petitioner.

The state responded to petitioner's evidence in the post-conviction court with its own expert, Dr. Richard Hulteng, a lawyer and forensic clinical psychologist. Hulteng reviewed Cunningham's extensive affidavit and a number of other documents, including the transcript of the 1992 penalty-phase rehearing, police reports, petitioner's criminal history, and other evaluations and affidavits prepared for the post-conviction case. Like Cunningham's affidavit, Hulteng's reports were extensive and technical. At bottom, Hulteng disagreed with a number of Cunningham's premises and, ultimately, his conclusions.

Hulteng disagreed with Cunningham's view of the availability of actuarial studies and base rates for capital sentencing purposes in 1992. As Hulteng stated in his report, it was not until 1998 that Cunningham would "publish his

first article advocating the use of institutional violence base rates for capital sentencing." That statement is consistent with Dickison's statement in 2001 that there were no experts in 1992 testifying about actuarial studies on future dangerousness. Hulteng also stated that he had not "come across any literature from that period taking the position advocated by Dr. Cunningham, namely that an expert should focus exclusively on the risk of violence within the prison or in old age upon parole." Although both petitioner and the state presented additional information on the nature of risk assessment and prediction of future dangerousness—and on the state of the art in 1992—suffice it to say that each side had its expert, and the experts disagreed.

The post-conviction court rejected petitioner's claim that counsel in 1992 were ineffective for failing to present evidence such as the evidence that he presented through Cunningham in the post-conviction case:

"65.  Petitioner presented the testimony of Dr. Mark Cunningham, through affidavit, on the issue of future dangerousness. The information regarding institutional violence base rates on which Dr. Cunningham relied was not published until six years after petitioner's 1992 resentencing proceeding.

"66.  Dr. Richard Hulteng credibly testified by affidavit that there were no experts in 1992 testifying about the prediction of future dangerousness based on actuarial studies and base rates.

"67.  Dr. Hulteng credibly testified that petitioner's prior arrest record was significant in predicting whether petitioner would be dangerous in the future, and that Dr. Cunningham failed to take that factor into consideration in forming his opinion.

"68.  Dr. Hulteng credibly testified that the testimony on future dangerousness in the 1992 resentencing proceeding * * * was generally consistent with clinical practices and available empirical literature at that time.

"69.  Dr. Hulteng credibly testified that Dr. Cunningham's interpretation of how actuarial principles should be applied in a capital sentencing context involves a number of assumptions * * * was not articulated by Dr. Cunningham until after petitioner was sentenced in 1992.

"70.   Petitioner failed to prove that trial counsel did not adequately investigate and present evidence on the issue of petitioner's future dangerousness in the 1992 resentencing proceeding."

In our view, the record supports those findings, and they are dispositive. As the state argues:

"Counsel cannot be faulted for failing to present an opinion like Dr. Cunningham's when the research on which such an opinion is based was not available at the time of trial, even assuming that it was otherwise reliable. Just as counsel is not constitutionally inadequate for failing to predict changes in the law, counsel is not inadequate for failing to predict changes in psychological research or other trends in current issues."

Petitioner nonetheless takes issue with the post-conviction court's findings, arguing that they are not supported by the record. He asserts that the post-conviction court "applied an erroneous standard by weighing the two expert opinions." But the post-conviction court did not weigh the evidence on the ultimate question, *viz.*, the risk that petitioner would commit future criminal acts of violence. Rather, it considered what type of evidence on the issue was available in 1992, what competent counsel in 1992 were doing, and whether petitioner met his burden to show both deficient performance and prejudice. In making that determination, the court considered the conflicting expert testimony. That was appropriate. Although petitioner views the conflicting evidence differently than does the state or the post-conviction court, the record supports the post-conviction court's findings. The court correctly rejected petitioner's claim that counsel were ineffective for failing to present evidence such as that presented by Cunningham. We reject without discussion petitioner's other arguments regarding deficiencies in counsel's treatment of the future dangerousness issue.

We turn to petitioner's fourth assignment of error. In his petition for post-conviction relief, petitioner alleged that trial counsel were ineffective in that they "failed to advise petitioner about his right of allocution at the sentencing hearing, thereby misleading petitioner into forgoing his right to speak in his own behalf before sentence was imposed. *See*

312

*Rogers*, 330 Or [282, 4 P3d 1261 (2000)]." The post-conviction
court made the following findings in rejecting that claim:

"88. Petitioner's presentation regarding the issue of
allocution, including the testimony and evidence of counsel,
Lynne Dickison, was not consistent.

"89. The statement of trial counsel, Lynne Dickison,
that she did not advise petitioner of his right to allocute is
not credible.

"90. The record does not establish that trial counsel
did not inform petitioner of his right of allocution.

"91. Petitioner's testimony in this proceeding regard-
ing his remorse for the murder was not credible.

"92. Taking part in allocution would have been incon-
sistent with petitioner's strategy of not participating in the
1992 resentencing proceeding on 'so-called' jurisdictional
grounds.

"93. Petitioner testified in this proceeding that he and
trial counsel agreed that he should not participate in the
resentencing, in order to avoid a possible waiver of a 'juris-
dictional' argument. Participation in allocution would have
been inconsistent with that strategy.

"94. In the 1992 resentencing proceeding, petitioner
did not express anything to the trial court which could
reasonably be interpreted as a desire to allocute.

"95. Had petitioner been given a specific opportunity
to make an unsworn statement in allocution to the jury, it
would not have made any positive difference."

On appeal, petitioner argues that counsel were inef-
fective when they "failed to advise him of his right to make an
unsworn statement in allocution at his penalty phase
retrial." According to petitioner, the right to allocute—that is,
make an unsworn statement to the sentencer, not subject to
cross-examination—was well-established in 1992. He asserts
that, had he been advised of his right to make such a state-
ment, he would have told to the jury about the consecutive
sentences he received on his non-aggravated-murder crimes.
He could have explained that, in light of those other sen-
tences, he would not be eligible for parole until at least 12 1/2
years after the 30-year minimum sentence he would serve on

a life sentence. That is, he claims, he could have reassured the jury that, even if they sentenced him to life in prison, he would not be released for at least 42 1/2 years. Petitioner also asserts that he could have made statements "accepting responsibility and of contrition" that would have been "powerful mitigation." Petitioner argues that that alleged deficiency in counsel's performance had a tendency to affect the result of the penalty-phase retrial:

> "The prejudicial effect of counsel's failure in this case is underscored by numerous studies on juror attitudes in capital cases, which show that remorse and the length of time a juror thinks someone sentenced to life imprisonment actually will serve are significant factors in jury decisions on whether to impose the death penalty."

The state responds that petitioner did not meet his burden to prove that trial counsel did not, in fact, advise him of his right of allocution. The state further asserts that the right of allocution on which petitioner relies was not established in 1992:

> "Petitioner's claim that he had a right to make an unsworn statement to the jury is based on *State v. Rogers*, 330 Or 282, 300-01, 4 P3d 1261 (2000). Obviously, that case had not been decided at the time of petitioner's 1992 penalty-phase retrial. * * * [T]he evidence supports the implicit findings and the conclusion of the post-conviction court that petitioner's trial counsel in 1992 had no reason to know of the principles that would be announced in *Rogers* eight years later. Petitioner did not prove, given the state of the law at the time, that reasonable trial counsel would have advised him that he had a right to allocute by making an unsworn statement to the jury."

Finally, the state maintains, petitioner failed to prove prejudice for two reasons. First, it asserts, "the evidence before the post-conviction court showed that a statement from petitioner in the form of allocution would have been cumulative and ineffectual." It notes that the jury heard a number of petitioner's statements of remorse, for example, in his statements to Detective Goodale. Second, the state asserts, "petitioner failed to prove prejudice because of his lack of credibility." It asserts that the post-conviction court found that petitioner would not have allocuted, had he been

advised of that right. "And even if petitioner had made a statement in allocution to the jury," the state concludes, "the evidence presented to the post-conviction court established that there were many reasons that the jury would not have found his statements credible."

Petitioner's argument on appeal rests squarely on the factual premise that he was unaware of his right to allocute and on the legal premise that competent counsel in 1992 would have informed him of that right. The post-conviction court found that petitioner did not "establish that trial counsel did not inform petitioner of his right of allocution." That finding is supported by the record. Petitioner testified that counsel did not inform him of the right to allocute, but the post-conviction court at least implicitly found petitioner not to be credible on the allocution issue. The court found that petitioner's presentation regarding the allocution issue "was not consistent." It noted that allocution would have been inconsistent with petitioner's strategy not to participate in the penalty phase in an attempt to prevent the trial court from having "jurisdiction" over him. The post-conviction court found, at least implicitly, that petitioner was not credible.[8]

Moreover, the post-conviction court found that Dickison's statement that she did not advise petitioner of his right to allocute was "not credible." Dickison's statements on the issue varied among a 2001 interview, her 2003 deposition, and her 2004 testimony in the post-conviction court. Among her other statements during her post-conviction testimony, Dickison—when asked whether she had discussed allocution with petitioner—agreed that she would have had every reason to. Dickison also testified that, if she was aware of the right of allocution in 1992, "and if I wasn't distracted by the one million one hundred things I was doing, I don't believe that there would have been any reason I would not

---

[8] As the state points out, the post-conviction court made an explicit finding that petitioner was not credible in his statement that he would have chosen to allocute, if he had known about it. That finding does not go, however, to the factual issue whether counsel told petitioner of the right.

have told" petitioner about the right of allocution. That testimony, and other portions of the post-conviction record, support the trial court's foundational finding that Dickison was not credible in her statement that she did not tell petitioner about the right of allocution and the court's ultimate factual finding that he was so informed. This court is bound by the post-conviction court's findings, which are supported by evidence in the record. Petitioner failed to meet his burden to show that counsel did not inform him of his right of allocution.

In any event, we agree with the state that, given the state of the law in 1992 governing the right of allocution, even if counsel had failed to inform petitioner of the right, counsel would not have failed to exercise reasonable professional skill and judgment. In his petition for post-conviction relief, petitioner cited *Rogers* for the proposition that he had a constitutional right to allocution. But *Rogers* was decided in 2000, eight years after petitioner's 1992 penalty-phase retrial. In 1992, no federal or state constitutional right to allocution was clearly recognized. As the Supreme Court said in its 2000 *Rogers* opinion, it was not even at that time clear whether the right to offer sworn testimony subject to cross-examination satisfied the right of allocution:

> "This court has determined that 'the right * * * to be heard by himself' in Article I, section 11, encompasses the right of all criminal defendants to allocution, which 'refers to a convicted defendant's opportunity to speak before sentencing[.]' *DeAngelo[ v. Schiedler]*, 306 Or [91,] 94, 93 n 1[, 757 P2d 1355 (1988)]. According to the state, however, *DeAngelo* leaves open the question of the form that allocution may take. The state is correct that *DeAngelo* does not resolve that issue directly."

330 Or at 296. The *Rogers* court stated that it was addressing "for the first time the parameters of allocution in the context of a capital sentencing proceeding, in which both jury and court play a role." *Id.* at 306. Moreover, as the *Rogers* court pointed out, the United States Supreme Court had not, at that time, "resolved definitively the questions of whether and to what extent the right of allocution may have a basis in the United States Constitution." *Id.* at 303.

Whether a capital defendant had a right to make an unsworn statement to the jury, not subject to cross-examination, was an open question in 1992. Although petitioner introduced evidence in the post-conviction court that some criminal defense lawyers were arguing for such a right in 1992, the state introduced evidence that the state had vigorously and successfully opposed that position. It follows that, had counsel not told petitioner that he could allocute, that action would not have shown a lack of professional skill and judgment. *See Wells v. Peterson*, 315 Or 233, 236, 844 P2d 192 (1992) ("Failure of petitioner's criminal trial counsel to contend that ORS 161.620 prohibited the sentence here was not inadequate assistance of counsel, because at the time of trial the meaning of the statute was not clearly settled. Reasonable counsel could have disagreed about whether to make that argument at the time that the original case was tried."); *Teague v. Palmateer*, 184 Or App 577, 592, 57 P3d 176, *rev den*, 335 Or 181 (2002) ("Because *Apprendi*'s[9] rule was new, counsel exercising reasonable professional skill and judgment could not anticipate that the law would develop as it did, and reasonable counsel could have disagreed as to whether to raise the argument that *Apprendi* eventually endorsed.").

## V. CONCLUSION

In conclusion, although petitioner demonstrated in the post-conviction court other ways in which counsel could have handled the 1992 penalty-phase retrial, he failed to prove that his counsel's performance both was deficient and that it had a tendency to affect the outcome of the proceeding. The post-conviction court did not err in denying relief.

Affirmed.

---

[9] *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000).