Argued and submitted November 21, 2011, affirmed February 15, 2012

MICHAEL JAMES HAYWARD,
*Petitioner-Appellant,*

*v.*

Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
98C19609; A142078

273 P3d 926

Rankin Johnson, IV, argued the cause and filed the briefs for appellant.

Timothy A. Sylwester, Senior Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Laura S. Anderson, Senior Assistant Attorney General.

Before Wollheim, Presiding Judge, and Armstrong, Judge, and Nakamoto, Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

In 1996, petitioner was convicted of aggravated murder and sentenced to death based on a murder that he committed in 1994. On direct review, the Supreme Court affirmed defendant's conviction and death sentence. *State v. Hayward*, 327 Or 397, 963 P2d 667 (1998). In this post-conviction proceeding, petitioner sought to have his conviction set aside due to constitutionally ineffective assistance of counsel during the guilt and penalty phases of his trial.[1] He appeals from the post-conviction court's rejection of his claims. For the reasons explained below, we affirm.

## I. THE UNDERLYING CRIMES

We begin with the facts of the underlying crimes as described in the Supreme Court's opinion on direct review of the conviction and death sentence:

"On April 10, 1994, four young men—Jason Brock, Daniel Rabago, Jason Brumwell, and Johl Brock—met at Brumwell's house and discussed committing a robbery in order to get money to buy marijuana. They decided to rob the Dari Mart on Royal Avenue in Eugene. That afternoon, they went to the store to see how many people worked there and whether there were surveillance cameras. They returned to Brumwell's house and continued to discuss the robbery. Jason Brock then went to work and played no role in the events that followed.

"The other three drove to defendant's house in Johl Brock's car to ask defendant, Michael Hayward, if he would like to join them in robbing the Dari Mart. Defendant agreed to participate and got into Brock's car to discuss plans for the robbery. They listened to 'death metal' music while they made their plans. Rabago, Brumwell, and Brock, who considered themselves Satanists, were members of a death metal band. Defendant was not a member of the band, but he enjoyed listening to death metal music. As Rabago testified, 'we were all into evil and we were all pretty much deathers.' Rabago described a 'deather' as 'someone that has a lot of hate in them and sees * * * the morbid things in life.' During the discussions that took

---

[1] During both phases of trial, petitioner was represented by two attorneys. For sake of convenience, we refer to "counsel" in the singular.

place in Brock's car, the four young men decided to kill their victims. They also discussed whether they would carve satanic symbols on the victims' bodies and whether they would leave a message written in the victims' blood on the Dari Mart wall. During the afternoon, they drove to Rabago's house to get weapons—a dumbbell bar, a thin metal bar about two feet long with one pointed end, a chisel-type hammer, and a knife. From Rabago's house, the four drove to the Dari Mart. Defendant and Johl Brock went in, and defendant bought cigarettes. They left the store to wait until closer to its 11:00 p.m. closing time before committing the crimes.

"Just before returning to the Dari Mart, the group listened to more death metal music to 'kill time' and become motivated about the crimes they were about to commit. At about 10:35 p.m., Donna Ream, one of the two clerks on duty at the Dari Mart, saw defendant standing in front of a window outside the store. He smiled and waved at her. A few minutes before 11:00 p.m., Rabago, Brumwell, Brock, and defendant went into the Dari Mart. Each young man had an assigned 'job' with respect to what transpired next.

"Defendant, followed by Brock, went to the back of the store. Brumwell and Rabago remained in the front. Brumwell, holding the dumbbell bar over his head and emitting a deep growl, ran toward Ream, who was standing behind the check-out counter. Ream said the growl sounded like a growl she heard later on a death metal compact disc by a group called Cannibal Corpse. Ream jumped back in fright. Brumwell said he was just joking and asked her to give him the money in the cash register. Ream did so.

"Meanwhile, defendant and Brock encountered the second clerk, Frances Wall, stocking the cooler in the back of the store. Brock watched defendant strike Wall in the back of the head with the pointed, thin metal bar, knocking her to the ground. Wall attempted to protect her head from more blows by putting her arms in front of her face. Defendant struck her on the head with the bar five or six more times, striking her as hard as he could. The blows shattered Wall's skull. Brock left the store, drove his car some 50 yards away and waited for the others to come out. Meanwhile, Brumwell handed Rabago the dumbbell bar and told him to watch Ream while he joined defendant in the back room. At some point, defendant shoved the pointed bar completely through Wall's skull. She died at the scene.

"Brumwell and defendant returned to the front of the store. Defendant, Brumwell, and Rabago then led Ream to the back room. Defendant told the others to hit her. Defendant told Brumwell that he had 'killed his' and wanted to know why Brumwell could not kill Ream. Despite Ream's efforts to defend herself, defendant and Brumwell hit her with the dumbbell bar and the bar that defendant had used to kill Wall. They struck her more than 50 times on her head and on her arms, which she had raised to try to shield herself from the blows. They also kicked her and stabbed her with the knife. She ran into the Dari Mart's bathroom and tried to shut the door, but was unable to, because both of her arms had been broken in several places. Defendant and Brumwell followed her into the bathroom, where they continued to beat her. At one point Brumwell paused and asked her, 'Why won't you just die, bitch?' Both men yelled profanities at Ream while they beat her. At one point, Brumwell shoved the dumbbell bar into Ream's mouth, knocking out two of her teeth.

"Sometime during the attack on Ream, the young men heard the bell that rings in the back room when someone comes in the front door. They stopped beating Ream and left the store. Ream threw herself against the bathroom door to close it. When she heard a boy's voice in the front of the store, she called out to him to call the police. Then Ream ran from the store to a house across the street and collapsed on the floor when the residents let her in. A large portion of her scalp was torn off by the blows to her head, a disk in her neck was herniated, she lost almost half of the blood in her body, and she suffered permanent damage to her arms and hands. Nonetheless, Ream never lost consciousness, and some months later she was able to identify photographs of her attackers, including defendant.

"Several months after the Dari Mart crimes, Rabago, Brumwell, and defendant camped in the woods outside the town of Curtin for an extended period of time. While there, they discussed committing another crime, and possibly another murder, after the 1994 Labor Day weekend. They were arrested at the camp just before Labor Day. Soon after his arrest, defendant told police that he was not a Satanist, but that he believed that 'God is weak and Satan is strong.' During his initial police interview, he showed no remorse for Wall's murder or the assault on Ream. He declared that Wall's was just another death, that 'life ain't worth shit,'

and that Wall would have died anyway. Defendant seemed amused about the crimes and the fact that he had been arrested."

327 Or at 399-402 (footnotes omitted).

Petitioner was charged with and convicted of three counts of aggravated murder, ORS 163.095, one count of intentional murder, ORS 163.115, two counts of felony murder, ORS 163.115, two counts of attempted aggravated murder, ORS 161.405; ORS 163.095, one count of first-degree assault, ORS 163.185, one count of first-degree kidnapping, ORS 163.235, one count of first-degree robbery, ORS 164.415, and one count of first-degree burglary, ORS 164.225. The three aggravated murder guilty verdicts merged into a single conviction of aggravated murder; the intentional and felony murder guilty verdicts and the robbery and burglary murder verdicts also merged into the single aggravated murder conviction; the two attempted aggravated murder verdicts merged into a single attempted aggravated murder conviction. Following a death-penalty-phase proceeding, a jury sentenced petitioner to death pursuant to ORS 163.150.[2] As

_____

[2] The death penalty statute, ORS 163.150, currently provides, in part:

"(1)(a) Upon a finding that the defendant is guilty of aggravated murder, the court, except as otherwise provided in subsection (3) of this section, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105(1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), or death. * * * In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence *including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating or mitigating evidence relevant to the issue in paragraph (b)(D)* of this subsection; however, neither the state nor the defendant shall be allowed to introduce repetitive evidence that has previously been offered and received during the trial on the issue of guilt. The court shall instruct the jury that all evidence previously offered and received may be considered for purposes of the sentencing hearing. * * *

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

noted, on automatic and direct review, the Supreme Court affirmed defendant's convictions and death sentence.

## II.   THE POST-CONVICTION CASE AND APPLICABLE LAW

Petitioner filed a petition for post-conviction relief raising 16 claims relating to trial counsel's effectiveness during both the guilt and penalty phases of trial. To prevail on his claims under Article I, section 11, of the Oregon Constitution, petitioner was required to prove, by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that the petitioner suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). To prevail on his claims under the United States Constitution, petitioner was required to prove that trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d

---

"(D) Whether the defendant should receive a death sentence.

"(c)(A) The court shall instruct the jury to consider, in determining the issues in paragraph (b) of this subsection, any mitigating circumstances offered in evidence, including but not limited to the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

"(B) The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering *any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense and any victim impact evidence as described in paragraph (a) of this subsection,* one or more of the jurors believe that the defendant should not receive a death sentence.

"(d) The state must prove each issue submitted under paragraph (b)(A) to (C) of this subsection beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue considered.

"(e) The court shall charge the jury that it may not answer any issue 'yes,' under paragraph (b) of this subsection unless it agrees unanimously.

"(f) If the jury returns an affirmative finding on each issue considered under paragraph (b) of this subsection, the trial judge shall sentence the defendant to death."

The first italicized text was added by the Legislative Assembly in 1995, Or Laws 1995, ch 531, § 2, and is the source of the current dispute. The second italicized text was added to the statute in 1997, Or Laws 1997, ch 784, § 1.

674 (1984). As we said in *Montez v. Czerniak*, 237 Or App 276, 278 n 1, 239 P3d 1023 (2010), *rev allowed*, 352 Or 321 (2011), the federal and state constitutional standards are functional equivalents. The post-conviction claim based on ineffective assistance of counsel essentially encompasses two elements: (1) that counsel performed deficiently and (2) that counsel's deficient performance prejudiced the petitioner, that is, that it had a tendency to affect the result of the trial. *Montez*, 237 Or App at 283.

The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances; the post-conviction court's standard of review is a highly deferential one. *Kimmelman v. Morrison*, 477 US 365, 381, 106 S Ct 2574, 91 L Ed 2d 305 (1986). That is, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 US at 689. In reviewing a post-conviction claim of ineffective assistance of counsel, the court "will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment[.]" *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823 (2003), *rev den*, 337 Or 327 (2004).

To prove prejudice of constitutional magnitude, petitioner was required to show that "counsel's advice, acts, or omissions had 'a tendency to affect the result of the prosecution.'" *Ashley v. Hoyt*, 139 Or App 385, 392, 912 P2d 393 (1996) (quoting *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995)). Whether a petitioner has demonstrated prejudice is a question of law that, in turn, may depend on predicate findings of fact. *Ashley*, 139 Or App at 395 n 8.

On appeal, this court is bound by the post-conviction court's findings if they are supported by evidence in the record. *Wyatt v. Czerniak*, 223 Or App 307, 311, 195 P3d 912 (2008). If the post-conviction court did not expressly make such findings, and there is evidence from which the facts could be decided more than one way, we will presume that

the facts were decided in a manner consistent with the court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). The right to effective assistance of counsel extends to the penalty phase of the trial. *Burger v. Kemp*, 483 US 776, 781, 107 S Ct 3114, 97 L Ed 2d 638 (1987).

In a 28-page opinion, the post-conviction court made findings and conclusions and rejected each of petitioner's post-conviction claims. On appeal, petitioner raises two assignments of error. Encompassed within those two assignments are 13 specifications regarding trial counsel's deficiencies in their representation of petitioner. We have considered and reject each argument; we write to more fully address three of petitioner's contentions.

## III. CLAIMS ADDRESSED ON APPEAL

### A. *"Satanism" and "death metal" music*

The first claim that we write to address relates to counsel's adequacy with respect to evidence of petitioner's interest in Satanism and "death metal" music. As the Supreme Court described in its opinion on direct review, at trial, the jury heard some evidence about Satanism without objection: that petitioner and his codefendants were Satan worshipers, that they were "into evil" and "pretty much deathers," that the group "maybe" listened to death metal music to prepare themselves for the crimes, and that the group had discussed a plan to carve satanic symbols into the bodies of whomever they killed. *Hayward*, 327 Or at 408. The jury also heard other evidence, over defense counsel's objections, that described death metal music and Satanism. In this post-conviction proceeding, as related to the guilt phase of trial, petitioner contended in his petition for post-conviction relief that trial counsel was ineffective (1) in failing to make pretrial motions *in limine* regarding the admissibility and relevancy of any evidence relating to Satanism and death metal music, and (2) in failing to make a motion for mistrial at the time of admission of that evidence.

In rejecting the assertions that counsel was inadequate in failing to file a pretrial motion *in limine* or a motion for mistrial, the post-conviction court found:

"[Trial counsel] made a deliberate tactical decision not to file [a motion *in limine* to limit the state's evidence] because they believed it would be futile and 'tip their hand' to the prosecution. [Trial counsel] testified that in their considerable experience the trial judge * * * typically would not rule pretrial on motions *in limine,* but instead would wait until the contested evidence was proffered at trial."

In rejecting the contention that counsel had been ineffective in failing to seek a mistrial upon introduction of the evidence, the post-conviction court held that, because the evidence was admissible as relevant, there was no basis for a mistrial:

"Because the evidence of death-metal music and Satanism that was admitted at trial was relevant, petitioner's trial counsel had no valid basis to move for mistrial. Petitioner did not prove that if his trial counsel had moved for a mistrial in a timely manner after admission of the evidence of death-metal music and Satanism, the trial court would have granted the motion."

On appeal, petitioner continues to assert that evidence of death metal music and Satanism was not relevant and was unduly prejudicial, and contends that the post-conviction court therefore erred in rejecting his claim that trial court was ineffective in failing to file a motion *in limine* to exclude all of it or to move for a mistrial after its admission.

When a petitioner in a post-conviction proceeding contends that trial counsel provided constitutionally inadequate assistance by failing to object to evidence, the petitioner is not entitled to post-conviction relief unless such an objection actually would have legal merit. *Peiffer v. Hoyt,* 339 Or 649, 660, 125 P3d 734 (2005). As the Supreme Court held in its opinion on direct review, in light of the state's theory that petitioner and his codefendants were motivated to commit the crimes at least, in part, by death metal music and Satanism, the evidence was relevant to establish that motive. *Hayward,* 327 Or at 407.[3] We accordingly reject petitioner's continued assertion that the evidence was not relevant.

---

[3] The Supreme Court explained:

"One of the theories underlying [the charges of murder] was that death metal music and satanism provided at least one of the motives for defendant [and his codefendants] when they planned and committed the Dari Mart crimes. The

On direct review, petitioner also contended that, even if relevant, the evidence was unfairly prejudicial under OEC 403[4] and should have been excluded. The Supreme Court rejected that contention for the reason that, in the context of the evidence that did come in without objection about Satanism and death metal music, the additional evidence to which petitioner objected was not unfairly prejudicial. *Id.* at 408.

In his petition for post-conviction relief, petitioner asserted that counsel was ineffective in not making a timely and adequate motion *in limine* to exclude the evidence of Satanism and death metal music, and in not making a timely motion for a mistrial when the evidence came in; we note, however, that he made no post-conviction claim of ineffective assistance of counsel based on a failure to object to evidence at trial.[5] As previously noted, the post-conviction court found that trial counsel's decision not to file a motion *in limine* to exclude the evidence was a tactical one in light of trial counsel's familiarity with the trial court's practice of denying motions *in limine*. There is evidence to support the post-conviction court's findings, and we conclude that the decision to not file the motion *in limine* was a reasonable exercise of defense counsel's professional judgment. For that reason, we conclude that petitioner has failed in his burden to show that defense counsel was ineffective in not seeking a motion *in limine*.

Despite the fact that the post-conviction court did not technically have before it a claim that trial counsel was ineffective in failing to object to *any* evidence regarding Satanism and death metal music, the post-conviction court made a finding that trial counsel had objected vigorously at

---

testimony to which defendant objected was relevant to the state's theory that defendant and the others intended to commit murder, not merely robbery[.]"

*Hayward*, 327 Or at 407.

[4] OEC 403 provides in part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The court on direct appeal also rejected petitioner's contention that the evidence was inadmissible under OEC 404(3) as a prior bad act, explaining that the evidence was admissible because it was relevant to the state's theory regarding petitioner's motive. *Hayward*, 327 Or at 409.

[5] Petitioner nonetheless contends in his appellate briefs that trial counsel was inadequate in failing to object each and every time such evidence was offered.

trial to the introduction of such evidence. The court further found that, "with respect to any evidence of 'death-metal music' and Satanism that was admitted at trial without a specific objection by his trial counsel, petitioner did not prove that that evidence would have provided a basis for reversal of his convictions if his trial counsel had objected." The post-conviction court essentially resolved the second of the two post-conviction inquiries, finding that counsel's allegedly deficient performance in failing to object to each offer of evidence had not caused prejudice to petitioner, because petitioner failed to show that preserving objections would have provided a basis for reversal of his conviction. The post-conviction court did not, however, expressly grapple with the issue whether trial counsel was ineffective in failing to object because *any* evidence was inadmissible under OEC 403 as unduly prejudicial.

At oral argument on this appeal, petitioner's counsel contended essentially that, if trial counsel had objected to *every* offer of evidence concerning Satanism and death metal music, the issue of whether the evidence was more prejudicial than probative under OEC 403 might have been resolved differently by the Supreme Court, resulting in a possible reversal. He contends that to date no forum has considered whether, despite its relevance, *any* evidence of Satanism and death metal music was inadmissible under OEC 403 and that this appeal is the appropriate forum for resolving that question. However, as noted, the post-conviction court did not have before it a claim that counsel was ineffective in failing to object to every offer of evidence of Satanism and death metal music. The post-conviction court could not grant relief on a ground not raised in the petition, ORS 138.550(3); *Bowen v. Johnson*, 166 Or App 89, 92-93, 999 P2d 1159, *rev den*, 330 Or 553 (2000), and we will not consider on appeal a post-conviction claim not raised in the post-conviction court, *Ramirez v. State of Oregon*, 214 Or App 400, 401, 164 P3d 1221, *rev den*, 343 Or 554 (2007).

Additionally, apart from counsel's statements at oral argument and a general assertion that the evidence was unduly prejudicial, petitioner did not cite OEC 403 in his appellate briefs and made no specific argument as to how a

balancing under OEC 403 would have led the court to conclude that the probative value of the evidence was substantially outweighed by its prejudice. We conclude for that additional reason that petitioner's argument on appeal is not well taken.

Finally, even if counsel performed deficiently in failing to object to any and all evidence of Satanism and death metal music under OEC 403, we would conclude, as did the post-conviction court, that petitioner has not established that he was prejudiced by that deficiency. Evidence is properly excluded under OEC 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Evidence is "unfairly prejudicial" if it appeals to the preferences of the factfinder for reasons that are unrelated to its capacity to establish a material fact. *State v. Barone*, 328 Or 68, 87, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000). Given the centrality of the evidence of Satanism and death metal music to the state's theory regarding defendant's intentions and motivation for the crime, and the relevance of the evidence to that theory, we conclude that any objection based on OEC 403 would not likely have led to the conclusion that all of the evidence should have been suppressed, because the probative value of that evidence far outweighed its prejudice to defendant.

### B.  *Mitigating evidence*

Pursuant to ORS 163.150(1), in the penalty phase of an aggravated murder prosecution, a defendant is entitled to introduce general mitigating evidence that militates against imposition of the death penalty. *State v. Wagner*, 309 Or 5, 14, 786 P2d 93, *cert den*, 498 US 879 (1990). As related to the penalty phase of the trial, petitioner contended in his petition for post-conviction relief that trial counsel was ineffective in failing to "investigate and present favorable witnesses to the Petitioner in regards to background and social history involving family dynamics." On appeal, petitioner contends that mitigation was inadequately developed and that, essentially, only a mitigation specialist[6] can meet the professional standards required in death penalty cases. Because of the failure

---

[6] Petitioner's witness testified that a "mitigation specialist" is a person who is a part of the defense team in a capital case and who is skilled at mitigation investigation and in the development of a mitigation record.

to hire a mitigation specialist, petitioner contends, the story of petitioner's life, including the psychological, medical, educational, and environmental influences, and their relationship to his conduct, was not adequately told.

At the post-conviction hearing, petitioner offered the testimony of an attorney, Grefenson; a mitigation expert, Miller; and a psychologist, Cooley, each of whom offered the opinion that more could have been done to cast petitioner in a positive light. Petitioner asserted that a mitigation expert could have identified better mitigation evidence and that counsel could have developed a better record in mitigation of petitioner's crimes through the testimony of witnesses who (1) could have better explained how petitioner's personal history, upbringing, and psychological makeup affected his behavior; (2) viewed petitioner in a positive and sympathetic light; and (3) would have testified that they would be sad if petitioner were executed.

In rejecting petitioner's contention that counsel was inadequate in failing to investigate and present mitigation evidence, the post-conviction court found:

"The additional testimony that petitioner presented in this proceeding did not differ significantly from what trial counsel offered in the penalty-phase trial."

In rejecting the contention that counsel did not adequately investigate and present evidence as to petitioner's upbringing, the post-conviction court found:

"_____ . * * * Petitioner's trial counsel did the best investigation that they could under the circumstances. Petitioner did not prove that the investigation by his trial counsel was objectively unreasonable.

"* * * * *

"59.   Petitioner did not prove that he had an abusive or highly dysfunctional family life. Petitioner's childhood was not significantly dissimilar from that of most people and was better than that of many. He had caring teachers and neighbors. He was raised in an intact middle-class family by parents who were consistently employed, and he was not subjected to poverty, sexual abuse, or neglect. Petitioner

denied that he suffered any significant physical abuse during his childhood. To the extent that his claim is premised on an assertion that petitioner had an 'abusive childhood,' the evidence does not support that premise.

"60. The type of mitigating evidence that petitioner attempts to rely on in this proceeding is the sort of double-edged sword that requires a calculated tactical decision by trial counsel. Petitioner's brother was raised in the same family over the same period of time, and nothing in this record suggests that he was provided preferential treatment by their parents. Although petitioner became remorselessly homicidal, his brother grew up to be a normal, well-adjusted productive citizen.

"61. Petitioner testified in this proceeding that he did not blame his parents for his crime, and he did not want his trial counsel to attempt to blame his parents for his crime.

"62. Petitioner's trial counsel were not constitutionally inadequate for deciding not to present additional evidence to describe the circumstances of his childhood because that evidence was only marginally relevant for that purpose and jurors reasonably could react negatively to it as a cynical attempt by him to blame his parents for his horrific crimes. Petitioner's father was an alcoholic, but petitioner does not believe that his father's drinking affected his upbringing or mental state."

With regard to petitioner's claim that counsel did not adequately elicit testimony from witnesses concerning the emotional impact of a death sentence on the witnesses' lives, the post-conviction court found:

"99. Given the heinous nature of the crime petitioner committed, the relative normalcy of his upbringing, and petitioner's lack of remorse, trial counsel reasonably could have concluded that presentation of such evidence would have been merely cumulative at best and would not have had persuasive value to the jury."

The state asserts that the post-conviction court's findings are supported by evidence in the record. We have reviewed the post-conviction record, and we conclude that the post-conviction court's findings relating to mitigation evidence are supported by the evidence. Considering the deference to be accorded to trial counsel, *Cunningham*, 186 Or

App at 226, we conclude that the post-conviction court did not err in rejecting petitioner's claims concerning the adequacy of counsel's investigation and presentation of mitigation evidence.

## C. *Victim impact evidence*

At the penalty phase of trial, petitioner made general objections to the introduction of any victim impact evidence, arguing that, under *State v. Guzek*, 322 Or 245, 906 P2d 272 (1995) (*Guzek I*), such evidence was inadmissible because it was irrelevant. He also argued that allowing victim impact evidence pursuant to the 1995 amendment to ORS 163.150(1)(a) violated the *ex post facto* provisions of the state and federal constitutions.[7] The trial court overruled petitioner's objections, and, during the penalty phase, the victim's husband, Daniel Wall, testified concerning the duration of his wife's employment at Dari Mart, her relationship with the couple's children, and how he broke the news of the victim's death to their seven-year-old son.

On direct review, petitioner contended on *ex post facto* grounds that the trial court erred in allowing Daniel Wall to give victim impact testimony during the penalty phase. *Hayward*, 327 Or at 413. The state argued that petitioner had failed to preserve his *ex post facto* argument, because the state had introduced victim impact evidence during the guilt phase of petitioner's trial without objection. The Supreme Court agreed. The court explained that Daniel Wall's testimony during the guilt phase of the trial—that Frances Wall was his wife—provided as foundation for his identification of her photograph, was "properly admitted victim impact evidence."[8] *Id.* at 414. The court concluded that, because that evidence had been properly admitted during the guilt phase without objection and petitioner's counsel

---

[7] Article I, section 21, of the Oregon Constitution provides, in part, that "[n]o *ex-post facto* law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution provides, in part, that "[n]o state shall * * * pass any * * * ex post facto Law * * *."

[8] We note that the Supreme Court, the post-conviction court, and the parties have all referred to the victim's husband as David Wall. At trial, he testified that his name is Daniel Wall, and, for that reason, in this opinion, we refer to him as Daniel Wall.

"failed to alert the trial court, in any appropriate way that would have allowed the trial court to respond, that [petitioner] objected to the introduction of victim impact evidence should there be a penalty phase, or that he wanted the court to limit the jury's consideration of Wall's testimony that Frances Wall was his wife,"

when petitioner asserted his general objection during the penalty phase to the introduction of victim impact evidence, "the record already included such evidence and [petitioner's] generic objection for the first time at the beginning of the penalty phase was insufficient to preserve his *ex post facto* argument." *Id.* The court thus declined to consider the merits of petitioner's argument on direct review. *Id.*

In his petition for post-conviction relief, petitioner contended that trial counsel was ineffective in "failing to make timely pretrial motions, timely specific trial objections, and a timely motion for mistrial regarding the admissibility of victim-impact evidence concerning the testimony of [Daniel] Wall at the guilt phase * * * and at the penalty phase." The parties filed motions for partial summary judgment on that issue in the post-conviction proceeding. Petitioner contended that the evidence was inadmissible—and that trial counsel therefore was ineffective in failing to seek to have it excluded in both phases—because the relevant statute, ORS 163.150, was not amended to allow such evidence until July 1995, four months before the November 1995 trial but after petitioner had committed the crimes in April 1994. The post-conviction court denied petitioner's motion and granted the state's motion for partial summary judgment, finding that petitioner had failed to establish that he suffered any prejudice as a result of the admission of the victim impact evidence that warrants post-conviction relief.[9]

Petitioner continues to contend on appeal that, as related to both phases of trial, trial counsel was inadequate

---

[9] The post-conviction court found:

"Petitioner failed to demonstrate that his trial counsel's failure to preserve an *ex post facto* objections to the admission of victim-impact evidence presented through Mr. Wall caused him to suffer prejudice to an extent that would warrant post-conviction relief under *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984), and *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995)."

in failing to object on *ex post facto* grounds to victim impact evidence in the form of testimony from Daniel Wall. Petitioner does not dispute that Daniel Wall's testimony during the guilt and penalty phases of trial concerning the victim and their children was properly admissible *if* ORS 163.150(1) (1995) applied. On appeal, the parties have briefed extensively whether state and federal *ex post facto* clauses bar application of ORS 163.150(1) (1995) in a trial for crimes committed in 1994.

We summarize briefly the current state of the law with regard to *ex post facto* prohibitions and victim impact evidence. In *State v. Metz*, 131 Or App 706, 887 P2d 795 (1994), *rev den*, 323 Or 483 (1996) (*Metz I*), we held that admission of victim impact evidence was reversible error because, under the version of the statute in existence at that time, victim impact evidence was not relevant to any of the original three penalty-phase questions or to the "fourth question" as then defined in ORS 163.150(1).

In response to *Metz I*, in 1995, the legislature amended ORS 163.150(1)(a) to expressly allow for the admission of victim impact evidence in the penalty phase in consideration of the fourth question. Then, in 1999, the voters amended Article I, section 42, of the Oregon Constitution by initiative to provide that the victim is entitled "to be heard at * * * sentencing," and that that right applies to all proceedings "pending or commenced on or after" the effective date and "supersedes any conflicting section of this Constitution." There followed a series of cases relating to the retroactive application of ORS 163.150(1)(a) (1995).

In *State v. Guzek*, 336 Or 424, 439-44, 86 P3d 1106 (2004) (*Guzek III*), *rev'd on other grounds by Oregon v. Guzek*, 546 US 517, 126 S Ct 1226, 163 L Ed 2d 1112 (2006), the Oregon Supreme Court held that the federal *ex post facto* clause does not bar victim impact evidence admitted pursuant to ORS 163.150(1) in the penalty phase of a trial for a crime committed before the effective date of ORS 163.150(1) (1995). The court further held that, in light of the 1999 amendment to Article I, section 42, of the Oregon Constitution, the admission of victim impact evidence on remand

would not violate the *ex post facto* clause of the state constitution. *See also State v. Acremant*, 338 Or 302, 311-15, 108 P3d 1139, *cert den*, 546 US 864 (2005) (citing *Guzek III*). In essence, the court held, Article I, section 42, trumps Article I, section 21, with respect to the admissibility of victim impact evidence. Therefore, it is undisputed that, if we were to remand this case for a new penalty-phase proceeding, the same victim impact evidence would be admissible under both the state and federal constitutions.

*Guzek III* expressly did not decide whether, in the absence of the 1999 amendment to the Oregon Constitution, admission of victim impact evidence pursuant to ORS 163.150(1) (1995) during the penalty phase of trial for a crime committed before the 1995 amendment to ORS 163.150(1) violated the state *ex post facto* clause. 336 Or at 440. However, although the court did not decide that precise question, the court did discuss the standard applicable to the *ex post facto* prohibition of Article I, section 21. The court explained that Article I, section 21, prohibits application of a change in the law that "alters the rules of evidence in a one-sided way that makes a sentence of death more likely than it would have been at the time that a defendant committed the aggravated murder[.]" *Id.* at 436.

At oral argument, petitioner conceded that, although the court in *Guzek III* did not expressly address Oregon's *ex post facto* provision in the context of victim impact evidence, *Guzek III* is "close enough to on point" to be dispositive of petitioner's contentions, and that petitioner's arguments are best taken up with the Supreme Court. However, in our view, under the Supreme Court's analysis, by making victim impact evidence available during the penalty phase, the 1995 amendment to ORS 163.150(1) *did* alter the statute in a way that makes a death sentence more likely than it would have been at the time petitioner committed the crime, and that—but for Article I, section 42, of the Oregon Constitution—its application to a crime committed before the amendment of ORS 163.150(1) would be barred by the *ex post facto* provision of the Oregon Constitution.

In *State v. Metz*, 162 Or App 448, 986 P2d 714 (1999), *rev den*, 330 Or 331 (2000) (*Metz II*), decided before *Gusek III*

and before the adoption of Article I, section 42, we considered whether the admission of victim impact evidence pursuant to ORS 163.150(1) (1995) violated the state *ex post facto* clause when applied to crimes committed in 1991, at a time when the law did not allow admission of such evidence. Citing *State v. Cookman*, 324 Or 19, 26, 920 P2d 1086 (1996), we described the test at that time as whether the amended statute "impermissibly 'retrenche[es] the rules of evidence' in a manner that affects defendant's substantive rights or whether it is simply an amendment to a uniform rule of evidence of general application that 'did not affect a substantive right.' " *Metz II*, 162 Or App at 457 (brackets in *Metz II*). We concluded that, before the 1995 amendments to ORS 163.150, victim impact evidence was not relevant to a jury's determination of the "fourth question," whether a defendant should receive a sentence of death, or the contingent "fifth question," whether a defendant should receive life imprisonment with or without the possibility of parole. 162 Or App at 459. We explained that, under the 1991 version of the statute, the jury could consider only mitigating evidence in answering the fourth question. Under the 1995 version of the statute, the jury is also permitted to consider aggravating evidence and victim impact evidence in determining whether a defendant should receive a death sentence. We concluded that, "although ostensibly merely a change in a rule of evidence," the

> "net effect of the amendment to ORS 163.150 permitting aggravating evidence, including victim impact evidence, at aggravated murder penalty-phase proceedings, was to make it possible for a jury to impose a harsher sentence than previously could have been imposed based solely on evidence that was *not relevant* to the inquiry at all under the previous version of the statute. We conclude that such a fundamental change regarding what evidence may be relevant to the issue before the jury runs afoul of the *ex post facto* provision of Article I, section 21, of the Oregon Constitution."

162 Or App at 460-61 (emphasis in original). The Supreme Court denied review of *Metz II*. 330 Or 331 (2000).

As noted by the Supreme Court in *Guzek III*, the 1995 amendment of ORS 163.150(1)(a) through the addition

of the text explicitly allowing the presentation of aggravating evidence gave the state an additional express statutory avenue to introduction of evidence against a defendant that is not relevant to the first three statutory questions and that pertains to a statutory question that is not subject to any burden of proof. 336 Or at 437. As we held in *Metz II*, the same conclusion applies with respect to victim impact evidence. It is true, as the state contends, that, unlike "aggravating evidence," which the court in *Guzek III* determined is "one-sided" and benefits only the state, "victim impact evidence" has the abstract potential to be neutral—*i.e.*, it is hypothetically conceivable that a defendant would introduce victim impact evidence to establish "the personal characteristics of the victim or the impact of the crime on the victim's family," to show, for example, the despicable character of a victim or that the death of the victim had no negative effect on family members. In reality, however, we doubt that the legislature had neutrality in mind in providing for victim impact evidence; in the great majority of cases, that evidence primarily benefits the state in a way that has the potential to make a sentence of death more likely, *i.e.*, to make the jury more likely to want to punish the defendant with death.

It is also true, as the state notes, that *Metz II* involved the "fifth question" of ORS 163.150(2), whether the defendant should be sentenced to life with the possibility of parole or life without the possibility of parole. Here, in contrast, the victim impact evidence goes to whether petitioner should be sentenced to death or should receive a life sentence. The state contends, therefore, that the analysis this court followed in *Metz II* does not directly govern this case because, unlike the fifth question, the fourth question does not impose a burden on the defendant or require him to convince a minimum number of jurors to impose a lesser sentence, but merely sets up a discretionary determination without a burden of proof.

We are not persuaded that the *ex post facto* analysis with respect to victim impact evidence results in a different outcome under the fourth question than under the fifth question. Under both questions, the 1995 amendment to ORS 163.150(1) allows the jury to consider adverse evidence that

it could not consider previously and that increases the likelihood of a more onerous sentence. We conclude therefore that Article I, section 21, prohibited retroactive application of the "victim impact evidence" provision of ORS 163.150(1)(a) (1995).

In light of that conclusion, we address petitioner's contentions that trial counsel was ineffective in failing to preserve objections to Daniel Wall's testimony at both the guilt and penalty phases of trial. As previously noted, during the guilt phase, the murder victim's husband testified very briefly that he was married to the victim and he identified her picture.[10] Before the penalty phase, petitioner's counsel made a general objection to the introduction of *any* victim impact evidence. Citing *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990),[11] the Supreme Court held that, having failed to object to "victim impact evidence" during the guilt phase, defense counsel's general objection at the start of the penalty phase was not sufficient to preserve an *ex post facto* argument with respect to the subsequently admitted testimony. *Hayward*, 327 Or at 413-14.

With respect to the guilt phase of trial, we reject petitioner's contention that trial counsel was ineffective in failing to object to the introduction of Daniel Wall's brief testimony on *ex post facto* grounds as "victim impact evidence."

---

[10] The entire testimony at the guilt phase consisted of the following:

"Q. State your name, please.

"A. Daniel Wall.

"Q. And Fran Wall was your wife?

"A. Yes.

"Q. I'll show you what's been marked for identification as State's Exhibit 33 and ask you if you can identify that?

"A. That's my wife."

[11] In *Brown*, the court stated:

" 'It is well established that when evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that other portions would not have been admissible had proper objections been made to such portions of the offered evidence.' *Sproul v. Fossi*, 274 Or 749, 755, 548 P2d 970 (1976) (citations omitted)."

310 Or at 359.

As we have previously noted, the reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Kimmelman,* 477 US at 381. Before the Supreme Court's opinion on direct appeal on petitioner's case, we do not think that counsel could reasonably have predicted that a failure to object to the brief foundational testimony that Daniel Wall provided to allow identification of the victim in a photograph could result in a waiver of subsequent objections to additional victim impact evidence in a subsequent penalty phase. We accordingly conclude that petitioner's counsel was not deficient during the guilt phase of trial in failing to object to the testimony of Daniel Wall.

With respect to representation during the penalty phase, counsel did make a general objection to any victim impact evidence, and the trial court overruled it. As we have concluded with respect to the guilt phase, counsel could not reasonably have anticipated prior to the Supreme Court's opinion in *Hayward* on direct review, that the previous admission of Daniel Wall's brief foundational testimony during the guilt phase would be treated as victim impact evidence that would necessitate specific objections to any further offer of victim impact evidence during the penalty phase. In light of what counsel reasonably could have anticipated to be the law at the time of trial, counsel reasonably could have assumed that a general objection to victim impact evidence at the start of the penalty phase was sufficient, and we conclude that counsel was not deficient in failing to make an additional specific objection to Daniel Wall's testimony during the penalty phase.

We further conclude, as did the post-conviction court, that, even if counsel's representation was deficient, the admission of the evidence was not so prejudicial as to establish a basis for post-conviction relief. As relevant to this claim, the post-conviction court found:

"6. The guilt-phase case against petitioner was overwhelming. He did not deny that he was involved in the incident underlying the charges, in which he brutally murdered Frances Wall with a metal bar and a co-defendant

severely beat Donna Ream. Ream and three of his co-defendants testified against him at trial. Petitioner had no plausible defense to the charges other than a claim that he had taken LSD earlier in the day and his mental capacity was adversely affected thereby at the time of the crime.

"7. Petitioner did not and does not have remorse for the crimes he committed. Petitioner testified that the murder 'was a waste of my time.' "

During the guilt phase of trial, the jury heard evidence that defendant struck the victim

"in the back of the head with the pointed, thin metal bar, knocking her to the ground. [The victim] attempted to protect her head from more blows by putting her arms in front of her face. Defendant struck her on the head with the bar five or six more times, striking her as hard as he could. The blows shattered [the victim's] skull. * * * At some point, defendant shoved the pointed bar completely through [the victim's] skull."

*Hayward*, 327 Or at 401. The jury also heard testimony that defendant encouraged his codefendants to murder a second victim and participated in her brutal beating. Defendant and a codefendant struck the second victim more than 50 times on her head and arms, kicked her and stabbed her with a knife, pursued her as she attempted to flee, and yelled profanities at her. The jury heard testimony that defendant expressed no remorse for his crimes and even seemed amused by them. The jury heard testimony that defendant enjoyed listening to death metal music, that he and his codefendants drew inspiration from death metal music as they planned their crimes, and that he and his codefendants discussed whether they would carve satanic symbols on the victims' bodies and whether they would leave a message written in the victims' blood on the Dari Mart wall.

The additional evidence at the penalty phase consisted of a brief description by Daniel Wall of the victim's relationship with their two younger children and how he informed their seven-year-old son about the victim's death:

"Q. Could you just describe the relationship that your wife had with your children?

"A.   Well, she loved my children a lot. There was—well, a lot of things I didn't know my children knew until after she died. So obviously she spent a lot of time. Like I didn't know my daughter knew the alphabet and my son knew how to spell his name.

"Q.   Will you tell us what you did in telling your boy about his mom's death?

"A.   * * *

"* * * I says, 'Danny'—my family was there and [the victim's] mom and dad was there, and I says, 'Danny, there's something I got to tell you about your mom.' All of a sudden his little hands went above my mouth several times to stop me from saying it. I said, 'No, son,' and I grabbed his hands. And I said, 'Your mama is dead.' He says, 'Huh-uh, Dad, you're teasing me.' And my mom looked at him and said, 'No, Danny, your mom is dead.' He looked at me and he says, 'Don't cry Daddy. I don't like to see you cry.' "

A petitioner proves prejudice of a constitutional magnitude by showing that counsel's failure had a tendency to affect the result of the prosecution. *Stevens*, 322 Or at 110. The court will not presume prejudice in the absence of proof. *Pinnell v. Palmateer*, 200 Or App 303, 323, 114 P3d 515 (2005), *rev den*, 340 Or 483 (2006). Petitioner's expert witness offered the opinion at the post-conviction hearing that Daniel Wall's testimony was "terribly damaging." However, other than that conclusory opinion, petitioner offered no evidence as to how, in light of the evidence concerning the brutality of the crime and defendant's lack of remorse, the relatively brief victim impact evidence had a tendency to cause the jury to choose a death sentence over imprisonment.

Finally and somewhat ironically, a decision regarding prejudice in this case must also include consideration of a change in the law after defendant's trial. The relief that petitioner seeks is a remand for a new penalty-phase trial without the victim impact evidence. The Supreme Court's holding in *Guzek III* means that, at a penalty-phase trial on remand, the evidence would be admissible by virtue of the retroactive application of Article I, section 42, of the Oregon Constitution. 336 Or at 439-44. Given the change to the Oregon Constitution, there is no meaningful relief available

to remedy the *ex post facto* violation.[12] Considering that fact along with the additional factors previously mentioned, we conclude that petitioner has failed to establish prejudice as the result of any representational inadequacy.

## IV.   CONCLUSION

Having considered each of petitioner's post-conviction contentions raised on appeal, we conclude that petitioner has failed to prove that his counsel's performance was deficient or that any deficiency had a tendency to affect the outcome of the proceeding.

Affirmed.

---

[12] As noted, in *Guzek III*, the court held that admission of the evidence does not violate the *ex post facto* clause of the federal constitution. 336 Or at 447.